# UNITED STATES *v.* SOUTHERN PACIFIC RAILROAD COMPANY.

# UNITED STATES *v.* SOUTHERN PACIFIC RAILROAD COMPANY.

APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF CALIFORNIA.

Nos. 921, 922.[1] Argued November 9, 10, 1892. — Decided December 12, 1892.

The intent of Congress in each and all of its railroad land grants was that the grant should operate at a fixed time, and should cover only such lands as at that time were public lands, grantable by Congress, and such a grant is not to be taken as a floating authority to appropriate lands within the specified limits which, at a subsequent time might become public land.

The grant of land made to the Atlantic and Pacific Railroad Company by the act of July 27, 1866, 14 Stat. 292, c. 278, and the grant to the Southern Pacific Railroad Company by the act of March 3, 1871, 16 Stat. 573, c. 122, were grants *in præsenti* which, when maps of definite location were filed and approved, took effect, by relation, as of the dates of the respective statutes.

The filing by the Atlantic and Pacific Company of a map of definite location from the Colorado River through San Buenaventura to San Francisco, under a claim of right to construct a road for the entire distance, was good as a map of definite location from the Colorado River to San Buenaventura.

The Atlantic and Pacific Railroad Company having duly filed a valid and sufficient map of definite location of its route from the Colorado River to the Pacific Ocean, which was approved by the Secretary of the Interior, the title to the lands in dispute passed thereby to that company under the grant of July 27, 1866, and remained held by it, subject to a condition subsequent, until their forfeiture under the act of July 6, 1886, 24 Stat. 123, c. 637; and by that act of forfeiture the title thereto was

---

[1] In No. 921, D. O. Mills and Garrit L. Lansing, Trustees, and Joseph E. Youngblood, were codefendants and appellees, with the Railroad Company. In No. 922, D. O. Mills and Garrit L. Lansing, Trustees, The City Brick Company, Thomas Goss, Edward Simmons and Albert A. Hubbard, were such codefendants and appellees.

retaken by the United States for its own benefit, and not for that of the Southern Pacific Railroad Company, whose grant never attached to the lands, so as to give that company any title, of any kind, to them.

THESE cases were argued, together with Nos. 862, 863 *post*, on the 6th, 7th and 8th of April, 1892, at October term, 1891. On the 18th of the same April, at the same term, they were ordered for reargument, before a full bench.

The reargument took place at this term on the 9th and 10th of November, 1892. The case then made, so far as it related to Nos. 921 and 922, was stated by the court as follows:

On July 27, 1866, Congress passed an act granting lands to aid in the construction of a railroad from the States of Missouri and Arkansas to the Pacific coast. 14 Stat. 292, c. 278. By the first section, a corporation to be known as the Atlantic and Pacific Railroad Company was created, and authorized to construct and operate a road from a point near the town of Springfield, in the State of Missouri, westward through Albuquerque, " and thence along the thirty-fifth parallel of latitude, as near as may be found most suitable for a railway route, to the Colorado River, at such point as may be selected by said company for crossing; thence by the most practicable and eligible route to the Pacific." The third section making the land grant is, so far as touching any question in this case is concerned, as follows:

" SEC. 3. That there be, and hereby is, granted to the Atlantic and Pacific Railroad Company, its successors and assigns, for the purpose of aiding in the construction of said railroad and telegraph line to the Pacific coast, and to secure the safe and speedy transportation of the mails, troops, munitions of war, and public stores, over the route of said line of railway and its branches, every alternate section of public land not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile, on each side of said railroad line, as said company may adopt, through the Territories of the United States, and ten alternate sections of land per mile on each side of said railroad, whenever it passes through any State, and whenever, on the line thereof, the United States have full title,

not reserved, sold, granted, or otherwise appropriated, and free from preëmption or other claims or rights, at the time the line of said road is designated by a plat thereof, filed in the office of the Commissioner of the General Land Office; and whenever, prior to said time, any of said sections or parts of sections shall have been granted, sold, reserved, occupied by homestead settlers, or preëmpted, or otherwise disposed of, other lands shall be selected by said company in lieu thereof, under the direction of the Secretary of the Interior, in alternate sections, and designated by odd numbers, not more than ten miles beyond the limits of said alternate sections, and not including the reserved numbers: *Provided*, That if said route shall be found upon the line of any other railroad route, to aid in the construction of which lands have been heretofore granted by the United States, so far as the routes are upon the same general line, the amount of land heretofore granted shall be deducted from the amount granted by this act."

The 18th section was in these words:

"SEC. 18. That the Southern Pacific Railroad, a company incorporated under the laws of the State of California, is hereby authorized to connect with the said Atlantic and Pacific Railroad, formed under this act, at such point, near the boundary line of the State of California as they shall deem most suitable for a railroad line to San Francisco, and shall have a uniform gauge and rate of freight or fare with said road; and in consideration thereof, to aid in its construction, shall have similar grants of land, subject to all the conditions and limitations herein provided, and shall be required to construct its road on the like regulations, as to time and manner, with the Atlantic and Pacific Railroad herein provided for."

On March 3, 1871, Congress passed an act, 16 Stat. 573, c. 122, to incorporate the Texas Pacific Railroad Company, and to aid in the construction of its road, the 23d section of which act reads:

"That for the purpose of connecting the Texas Pacific Railroad with the city of San Francisco, the Southern Pacific Railroad Company of California is hereby authorized (subject to the laws of California) to construct a line of railroad from

a point at or near Tehachapa Pass, by way of Los Angeles, to the Texas Pacific Railroad at or near the Colorado River, with the same rights, grants and privileges, and subject to the same limitations, restrictions and conditions, as were granted. to said Southern Pacific Railroad Company of California by the act of July twenty-seven, eighteen hundred and sixty-six: *Provided, however,* That this section shall in no way affect or impair the rights, present or prospective, of the Atlantic and Pacific Railroad Company or any other railroad company."

Under the act of July, 1866, the Atlantic and Pacific Company proceeded to construct a part of its road, but did no work west of the Colorado River, the east line of the State of California. It did, however, file maps of that which it claimed to be its line of definite location from the Colorado River to the Pacific Ocean, which, on April 11, 1872, and August 15, 1872, were accepted and approved by the Secretary of the Interior. On July 6, 1886, Congress passed this act of forfeiture:

## "An act to forfeit the lands granted. to the Atlantic and Pacific Railroad Company, etc.

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That all the lands, excepting the right of way and the right, power and authority given to said corporation to take from the public lands adjacent to the line of said road material of earth, stone, timber and so forth, for the construction thereof, including all necessary grounds for station buildings, workshops, depots, machine shops, switches, side-tracks, turn-tables and water-stations, heretofore granted to the Atlantic and Pacific Railroad Company by an act entitled ' An act granting lands to aid in the construction of a railroad and telegraph line from the States of Missouri and Arkansas to the Pacific coast,' approved July twenty-seventh, eighteen hundred and sixty-six, and subsequent acts and joint resolutions of Congress, which are adjacent to and coterminous with the uncompleted portions of the main line of said road, embraced within

both the granted and indemnity limits, as contemplated to be constructed under and by the provisions of said act of July twenty-seventh, eighteen hundred and sixty-six, and acts and joint resolutions subsequent thereto and relating to the construction of said road and telegraph, be and the same are hereby declared forfeited and restored to the public domain." 24 Stat. 123, c. 637.

On April 3, 1871, just a month after the passage of the act of March 3, the defendant, the Southern Pacific Company, filed a map of its route from Tehachapa Pass by way of Los Angeles to the Texas Pacific Railroad, and proceeded to construct its road, and finished the entire construction some time during the year 1878. Its road crossed the line, as located, of the Atlantic and Pacific Company. The lands in controversy in these cases are within the granted or place limits of both the Atlantic and Pacific and the Southern Pacific Companies at the place where these lines cross. As the Atlantic and Pacific Company did not construct its line, and as its rights were subsequently forfeited by Congress, and as the Southern Pacific Company did construct its line, the latter claimed that by virtue of its grant and the construction of its road these lands became its property. It was to test this claim of title, and to restrain trespasses by the railroad company, and those claiming under it, on the lands, that these actions were brought in the Circuit Court of the United States for the Southern District of California. In that court the decisions were in favor of the defendants, and decrees entered dismissing the bills, from which decrees the government brought its appeal to this court. See 39 Fed. Rep. 132; 40 Fed. Rep. 611; 45 Fed. Rep. 596; 46 Fed. Rep. 683.

*Mr. Assistant Attorney General Maury* for appellant.

A careful examination of the several statutes will show that the Southern Pacific Company, the defendant, is an essentially different corporate entity from the beneficiary of the land grant of the same name, and therefore was not authorized to earn the grant or receive the patents. On the other hand the

Atlantic and Pacific Company was not only created by Congress but required, as a condition of its being, to carry forward the enterprise of constructing and operating a transcontinental highway, from Springfield, Missouri, to the Pacific Ocean, assigned to it by the act of July 27, 1866, while on the other hand the Southern Pacific Company was merely "authorized" by that act, as a state instrumentality, to connect with the Atlantic and Pacific road, at such point near the boundary line of California as should be deemed most suitable for a railroad line to San Francisco, and was merely "authorized" by the act of March 3, 1871, "subject to the laws of California," to construct a road from Tehachapa Pass, by way of Los Angeles, to the Texas Pacific road at or near the Colorado River. In other words, it became the legal duty of the Atlantic and Pacific Company, on accepting its grant and charter, to build and maintain its road, whereas the Southern Pacific Company had a mere option in the premises and was not bound to do anything.

So far, therefore, from it being a matter of surprise that the rights and privileges conceded by Congress to this state corporation are so guarded and so subordinated to the grant to its own corporation as not to endanger or obstruct the attainment of the important object for which that corporation was instituted, it was to be expected that it would be so.

The Southern Pacific Company accepted its two grants with full notice of their subordinate and secondary character. It was warned by the act of March 3, 1871, that if it selected a route that was to any extent upon the same general line as that of the Atlantic and Pacific Company a proportionate deduction would be made from the lands called for by the Southern Pacific grant; in short, that in such a contingency the state corporation should be stripped of its grant *pro tanto*, in order to prevent a failure *pro tanto* of the grant to the Federal corporation.

It was further warned by the proviso of section 23 of the act of March 3, 1871, that its grant by that act "shall in no way affect or impair the rights, present or prospective, of the Atlantic and Pacific Railroad Company, or any other railroad

company." The language of this proviso was exceptional and, it is believed, unprecedented in the history of Congressional land grants. It was made so because Congress intended that the subordination and subjection of the Southern Pacific grant to the Atlantic and Pacific should be exceptional in its rigor, so that it should not happen that the Atlantic and Pacific grant would be involved in any entanglement with that of the Southern Pacific, whose line it would probably intersect somewhere near the Pacific coast.

To interpret these grants properly we must look at the condition of things that existed in March, 1872, when the intersecting part of its line of route was filed by the Atlantic and Pacific Company, which had begun to build from the eastern end of its road and believed in its ability to complete the work from end to end.

It would seem to be absolutely clear, in the light of the decisions of this court, that the lands covered by the overlap never came within the reach of the Southern Pacific grant of 1871, because the title to them passed to the Atlantic and Pacific Company on July 27, 1866. This was the necessary and inevitable effect of the latter company's location of its route in March, 1872.

If, then, the effect of locating the route of the Atlantic and Pacific Company on the earth's surface in March, 1872, was to vest the title of the lands in suit in that company as of the 27th day of July, 1866, as was undoubtedly the case under the decisions of this court, it is difficult to comprehend by what legal process the title so vested was cast upon the Southern Pacific Company. The argument does not appear to be advanced by showing that the Atlantic and Pacific Company constructed no road in California, unless it can be also shown that the lands in question, which, be it observed, were never subject to the Southern Pacific grant, became, nevertheless, vested in that company after Congress had declared them forfeited to the United States and restored to the public domain by the act of 1886. Nor is it by any means apparent how the judicial department of the government could, in any event, decree lands to belong to the Southern Pacific Company which

Congress has declared by law shall be "restored to the public domain," as forfeited by a delinquent grantee.

I. As to the lands lying within the granted limits of both roads.

The objections to be first considered under this head are that the Atlantic and Pacific Company never lawfully designated its line of route, (1) because it filed maps, at different times, of segments of its route, (2) because these maps were filed in the office of the Secretary of the Interior, instead of the General Land Office, and (3) because the route, as originally designated, ran all the way from Springfield to San Francisco *via* San Buenaventura.

The maps, thus filed, made, together, one continuous line of location, and were approved by the Secretary of the Interior; and it is no objection that they were filed at different times. *St. Paul & Pacific Railroad* v. *Northern Pacific Railroad*, 139 U. S. 1, 18, 19.

The second objection is entirely confuted by the case of *Buttz* v. *Northern Pacific Railroad*, 119 U. S. 55, 72, where the grant required that the line of definite location should be filed in the office of the Commissioner of the General Land Office, but it was really filed in the office of the Secretary of the Interior. The court, however, considered it as a matter of indifference whether the filing was in the one office or the other, the filing in the office of the Secretary being, to all intents and purposes, a filing in the land department of the government.

The remaining and third objection is, that if any line of location at all is to be considered as having been filed, it was one extending from Springfield to San Francisco, which, having been disapproved as to the part running from San Buenaventura to San Francisco, must be taken to have been rejected *in toto*, being an entirety.

This theory is diametrically opposed to the action of the Interior Department, which has treated the line of route from Springfield to San Buenaventura as a valid designation under the law. It is, furthermore, opposed to the well-known principle that where a transaction cannot have effect in the

manner intended by the parties to it, it will be allowed to operate in some other way, if possible, *quando res non valet ut ago valeat quantum valere potest.* *Kanawha Coal Co.* v. *Kanawha and Ohio Coal Co.*, 7 Blatchford, 391; *Jackson* v. *Bowen*, 7 Cowen, 13; *Robinson* v. *Ryan*, 25 N. Y. 325; *Ruggles* v. *Barton*, 13 Gray, 506; *Grover* v. *Thatcher*, 4 Gray, 526; *Hunt* v. *Hunt*, 14 Pick. 374; *S. C.* 25 Am. Dec. 400; *Freeman* v. *McGraw*, 15 Pick. 82.

Assuming that there was a valid location of the Atlantic and Pacific route on March 12, 1872, it does not admit of question that the lands involved became, by operation of law, subject to the grant of July 27, 1866, as of that day and date. *Schulenberg* v. *Harriman*, 21 Wall. 44; *Leavenworth, Lawrence &c. Railroad* v. *United States*, 92 U. S. 733; *Missouri, Kansas & Texas Railway* v. *Kansas Pacific Railway*, 97 U. S. 491; *Railway Co.* v. *Alling*, 99 U. S. 463; *Van Wyck* v. *Knevals*, 106 U. S. 360; *St. Paul & Sioux City Railroad* v. *Winona & St. Peter Railroad*, 112 U. S. 720.

It is true, the Atlantic and Pacific Company did not earn the right, under the grant, to appropriate the lands in question as absolute owner, and that it lost all its rights in them by forfeiture in 1886; but that had no relevancy to the matter in hand, seeing that the moment the line of its road was located the legal title to the lands granted vested in the company with the same force and effect as if they had been described in the grant by metes and bounds. If the title, thus vested, was divested before the act of forfeiture in consequence of the defaults of the Atlantic and Pacific Company, there was no occasion for the enactment declaring that the lands were "forfeited and restored to the public domain?" And if, in consequence of such defaults, the subsequent grant to the Southern Pacific Company attached to these lands in some magical way, as yet undefined and unknown, why were they "restored to the public domain" by the act of 1886, when they belonged to that company?

The vitality of the grant to the Atlantic and Pacific Company was in no degree impaired by the default of the Company touching the construction of its road in California. *Lake*

*Superior Ship Canal, etc.* v. *Cunningham,* 44 Fed. Rep. 820. So long as the United States chose to indulge that company and condone its default under the grant, no person, natural or artificial, had a right to treat the vested interests of the Atlantic and Pacific Company otherwise than they would have treated them if that company had been punctually performing the conditions of its grant. *Schulenberg* v. *Harriman,* 21 Wall. 44, 62; *Frost* v. *Frostburg Coal Company,* 24 How. 278.

The author of the grants. here involved is the sovereign owner of the land granted. It is not to Coke on Littleton or Cruise's Digest that. we go for the law of the grants, but to the grants themselves; and when the grantor says that the grant of a float shall take effect from its date and not the date of its location, the sovereign will must have effect regardless of consequences. Nothing could be more conclusive on this subject than the language of Mr. Justice Field in *Missouri, Kansas & Texas Railway* v. *Kansas Pacific Railway,* 97 U. S. 491, 497.

From the ground taken by the appellees' counsel, one might suppose that the retroactive feature of land grants was an anomaly in the law, instead of being a recent application of a principle which has been commonly employed for ages, which is known at common law as the doctrine of relation, and which, as Maule, J., defined it in *Graham* v. *Furber,* 14 C. B. 152, is "treating a thing as happening at some preceding time." See also *Panter* v. *Attorney General,* 6 Bro. P. C. 486; *Latless* v. *Holmes,* 4 T. R. 660; *Regina* v. *Riley,* Dearsly, C. C. 149.

And do not our recording statutes all over the land provide that, in certain cases, deeds shall operate from delivery by relation, and not merely from the date of their recording?

And by relation the executor's and administrator's title goes back to the decedent's death.

The doctrine of ratification, also, furnishes many examples where the principle of relation operates precisely as it does in land grants.

By the Roman law the birth of a posthumous child annulled the father's will although he knew his wife to be *enceinte;* for

by that law a child *in utero* could neither be instituted as heir nor disinherited, and thus we see, that the father was by relation made to die intestate in consequence of an event against which it was impossible for him to provide. 1 Demangeat, Cours de Droit Romain, 667, (3d ed. Paris, 1876.) This example is the more instructive when we remember that with the Romans intestacy was a kind of misfortune, and sometimes a blot on the intestate's memory.

A Roman taken by the enemy became a slave, and from the moment of capture all his rights as a Roman citizen ceased to be operative; but if he returned to his country they revived by the *jus postliminii*, and he was reinstated in them not only for the future, but for the past, and just as if he had never been in the power of the enemy. 1 Ortolan Inst., 128, (10th ed. Paris, 1876.) Here, then, was another class of cases where the doctrine of relation was applied with severity. The returned captive resumed the rights he had left behind him (*post limen*) utterly regardless of anything that had occurred during his captivity.

It would be a waste of time to argue further in support of the proposition that the land lying within the granted limits of the two companies was absolutely vested in the Atlantic and Pacific Company from the date of the grant, and, therefore, was never subject to the Southern Pacific grant; and that, as a corollary, the forfeiture of the Atlantic and Pacific grant inured to the benefit of the United States alone.

II. As to lands within the indemnity limits of the Atlantic and Pacific and within the primary limits of the Southern Pacific. This is the status of the lands involved in cases numbered 862 and 863.

When the Atlantic and Pacific road was located in March, 1872, it not only supplanted the Southern Pacific road as to granted but also as to indemnity lands at the point of intersection. This was absolutely necessary to give proper effect to the proviso. If the lands in the indemnity belt of the Atlantic and Pacific were not subject to the grant of the Southern Pacific at the time the latter's grant took effect, then no change in their condition afterwards could bring them

within the operation of the grant. *Leavenworth &c. Railroad* v. *United States,* 92 U. S. 733.

Every right of the Atlantic and Pacific Company as to its grant was as vital and operative up to the act of forfeiture as it was when the grant was accepted in 1866. The unreasonableness of the opposite view is shown, at once, by asking: At what time before the forfeiture did the grant begin to wane and lose vigor? Certainly its force was unimpaired in 1871, five years after its date, when Congress authorized the grantee to mortgage its road. 17 Stat. 19, c. 33.

But if it is doubtful whether these indemnity lands passed by the grant of the United States to the Southern Pacific Company the mere existence of that doubt entitles the United States to a decree for the surrender and cancellation of the patents covering these lands, on the well-established principle that public grants should be construed most strongly against the grantee, and all doubts in them resolved in favor of the government. *Leavenworth &c. Railroad* v. *United States, supra; Slidell* v. *Granjean,* 111 U. S. 412.

III. As to lands through which the two roads have the same general route.

A glance at the official map showing the lines of the two roads at and near the point of intersection, shows that for some distance before the lines cross they pursue the same general route, and thus the Southern Pacific grant is brought directly within the operation of the last proviso of section 3 of the act of July 22, 1866, which provides: "That if said route shall be found upon the line of any other railroad route, to aid in the construction of which lands have been heretofore granted by the United States, so far as the routes are upon the same general line, the amount of land heretofore granted shall be deducted from the amount granted by this act."

It is claimed for the government that this is an express limitation on the Southern Pacific grant, and requires a withdrawal from the grant of all lands within its limits to the full extent that that road runs on the same general route as the Atlantic and Pacific.

IV. As to lands within the claimed limits of the San José

grant. These lands were *sub judice*, on the 3d of April, 1871, and came within the principle laid down in *Doolan* v. *Carr*, 125 U. S. 618, 632, where the court said: "Indeed, this exclusion did not depend upon the validity of the claim asserted, or its final establishment, but upon the fact that there existed a claim of a right under a grant by the Mexican government, which was yet undetermined, and to which, therefore, the phrase 'public lands' could not attach, and which the statute did not include, although it might be found within the limits prescribed on each side of the road when located."

*Mr. Joseph H. Call,* special attorney on behalf of the United States, filed a brief for appellant.

*Mr. James C. Carter* for appellees.

The facts warrant us in saying that these suits, brought by the government to annul its grants, did not originate in any substantial failure, real or pretended, by the Southern Pacific Company to earn the lands by a prompt and faithful performance of every condition imposed upon it; nor in any actual inability on the part of the government to convey the particular lands in dispute arising out of other dispositions, actual or contemplated, of the said lands, and of consequent conflict with other interests. It is not questioned that the company faithfully constructed the road according to the requirements of the law, nor that the same was duly accepted. It is admitted that at the time the patents were issued the lands embraced by them were a part of the public domain, free from any appropriation or claim which constituted any obstacle in the way of conveying them to the company, and were in all respects disposable by the government for the purpose of aiding its railroad enterprises.

So far, therefore, as the main discussion goes, it resolves itself into these three questions: (1) Whether the Atlantic and Pacific Company ever designated its route; (2) whether such a designation, if made, operated, from the mere circumstance that the grant to this company was prior in time to

that made to the Southern Pacific Company, to exclude the lands in the overlapping limits at the place of crossing from the latter grant; (3) whether, if such designation was made, the proviso in § 23 of the act of March 3, 1871, protecting the rights "present and prospective" of the Atlantic and Pacific Company was designed for any other purpose than to save to it any lands which it might eventually earn by a full performance of its undertaking.

There is, however, another ground upon which a portion of the grant is assailed, viz.: that, after the confirmation by the California Land Commission created by Congress in 1851, and, on appeal, by the District Court of the United States for the Southern District of California, and by the Supreme Court of the United States, of a certain Mexican grant for a place called San José, certain surveys were had for the purpose of ascertaining and settling the bounds of the confirmed grant; that one of them, called the Hancock survey, did not embrace within its limits the lands in question, but that another, called the Thompson survey, did embrace them; that these surveys were before the proper officers of the government for many years, and were neither of them finally and completely adopted, but that on June 17th, 1871, both were set aside and another was adopted and confirmed by the proper authorities of the United States; and that, although this did not embrace any of the lands in question, yet that the circumstance that an unauthorized survey did embrace them, rendered the lands *sub judice*, as the phrase is, and took from them the character of public lands of the United States subject to grant, which otherwise they would have had; and that, consequently, they were excluded from both the railroad grants of 1866 and 1871, whether made to the Atlantic and Pacific or to the Southern Railroad Company.

I. Are there any reasons arising out of rigid and unyielding rules of law which support the claim made by the government in these suits? This is the main subject of this argument. It is a safe observation to make at the start, to say that there is nothing else to support them. Cases more destitute of substantial equity could scarcely be imagined.

It must be admitted (1) that Congress intended that the company should have these identical lands; (2) that the proviso upon the strength of which the government bases its main effort to withhold the lands from the company was inserted only by way of tender regard for the possible rights of the Atlantic and Pacific Railroad Company; (3) that the possible contingency contemplated by this proviso, in which the government would be unable to carry out its purpose of bestowing these lands upon the Southern Pacific Company, has not arisen, and can never arise; and (4) that the Southern Pacific Company has promptly, completely, in good faith and to the satisfaction of every department of the government having any concern with the matter, complied with every condition of its grant. And yet, in the face of all this, the government, by these suits, seeks to wrest these lands from the company, not because it wishes to apply them to some purpose of its own to which they had been devoted prior to the grant, nor because it needs them in order to enable it to fulfil some prior engagement with other parties; but simply in order to restore them to the public domain where they were at the time of the grant, in order that it may deal with them as its own absolute property and as it pleases. In this there is not only no equity, but an amazing inequity.

II. So far as concerns any question in these causes, the corporation formed under the laws of California, under the name of the Southern Pacific Railroad Company, on December 2, 1865, and which became amalgamated under the same name with other companies, by articles of amalgamation, dated October 11, 1870, and afterwards amended on April 11, 1871, did not cease to exist or lose its identity by the subsequent amalgamation under articles dated August 12, 1873; and was the same corporation to which the grant of March 3, 1871, was made, and which constructed the road thereunder, and is now one of the defendants in this action.

The several corporations amalgamated were of the same character. They were after, as well as before, consolidation, railroad persons, possessing powers of precisely the same nature; and the legislative intent that identity and continuity

of existence should not be destroyed is entirely clear. The legislative provision under which the consolidation was effected was a part of the general law of California. It was the evident purpose of Congress to connect and associate the franchises, which it granted, with those which its grantee had received from the State of California. It could not have contemplated that upon any such change that company would have authority under its state charter to proceed and construct the road, and yet that its own grant for that purpose would thereupon fail.

III. If it be said that the grant was of a franchise, or that a franchise was the principal subject of it, still the title of the Southern Pacific Company would not be thereby impaired. Franchises themselves are assignable with the assent of the government granting them, and such assent was in the present case given. *Thomas* v. *Railroad Co.*, 101 U. S. 71; *New Orleans, Spanish Fort &c. Railroad* v. *Delamore*, 114 U. S. 501.

IV. The attempt made by the bill to impeach the title of the Southern Pacific Company to lands which lie within the alleged intersecting limits of the grant to that company and of the prior grant to the Atlantic and Pacific Company, where the two routes cross, is wholly destitute of support in any of the forms in which it is made.

(a) It would be a sufficient answer to this objection to point, as the learned judges in the court below did, to its total want of equity. Nothing can be clearer than that the lands in dispute were destined and dedicated by Congress to the object of procuring railroad lines to the Pacific. Several independent routes were designed and provided for; and, inasmuch as such routes could not be definitely located by Congress itself when it made the grants, it was necessary to leave it to the companies themselves to make the definite location, subject, of course, to certain limitations prescribed by the acts making the grants. This necessarily involves the possible consequence of an overlap when the routes should be finally located; and in such case the conflicting rights would be settled, except perhaps where the lines were found on the same general route,

by giving priority to the prior grant when the grants were of different dates, provided both grantees were otherwise entitled to the land; and, if the grants were of the same date, by applying the equitable rule of equal enjoyment, and awarding a moiety to each. In respect to lands in indemnity limits, priority would depend, not on the comparative dates of the grants, but on the dates of selection.

But to hold that the same course was to be pursued where the company having the prior grant had never done anything to earn the land which it might otherwise claim, and whose rights had been absolutely extinguished by formal forfeiture, and the company having the later grant had earned its land by a prompt compliance with every obligation, that is to say, to apply a doctrine applicable only to disputes between two grantees, both of whom had confessedly earned the land and were entitled to it as against the United States, the grantor, to a case where one had earned it and the other had not earned, and never could earn it, and thus make the default of one the very ground of robbing the other of his well-earned reward, would seem to be a mere caricature of justice, hardly entitled to the compliment of formal refutation.

(b) All forms of this objection now under notice rest upon the proposition that the Atlantic and Pacific Company had actually designated its route in accordance with the act of July 27, 1866. But that company never has designated any route in accordance with the terms of the grant made to it, and the objection to the title of the Southern Pacific Company now under notice, in whatever form asserted, must fail.

The route actually selected by the Atlantic and Pacific Company was made up of fragmentary portions, having no connection with each other, and adopted and filed with the Land Department at different times. If we concede that it was competent to that company to thus designate its route in fragments, it did not become designated until the filing of the last portions of it, which was on August 15, 1872, and probably not until their acceptance in August, 1874.

(c) But conceding, for the sake of argument, that the Atlantic and Pacific Company made a sufficient designation

of its route, the pretence that by this act, without more, the Southern Pacific Company was prevented from acquiring title to the lands in controversy, has as little foundation in technical rules as it has in the principles of equity. The settled doctrines of this court in relation to grants of land for railroads very clearly overthrow it. *Wisconsin Central Railroad* v. *Price County,* 133 U. S. 496; *St. Paul & Pacific Railroad* v. *Northern Pacific Railroad,* 139 U. S. 1; *Missouri, Kansas & Texas Railway* v. *Kansas Pacific Railway,* 97 U. S. 491, 497; *St. Paul & Sioux City Railroad* v. *Winona & St. Peter Railroad,* 112 U. S. 720; *Cedar Rapids & Missouri River Railroad* v. *Herring,* 110 U. S. 27.

(*d*) The counsel for the government have made it their chief effort to show that the lands in controversy were, or have been, in some form excepted from the grant to that company, so that the grant was not operative upon them; and if this were so, it would be very true that no considerations of justice or equity would be pertinent to the discussion. That company can certainly lay no legal or equitable claim to lands never intended to be granted to it.

The Southern Pacific Company had the right to proceed at once to designate its route, which it did by filing its plat on the 3d of April, 1871. This was immediately operative to attach the grant made to the company to the lands embraced in it generally, all along that route. Nor can it be doubted that by the designation, the grant to the Southern Pacific Company became immediately operative upon the lands in controversy, and gave to that company precisely the same right or title thereto which it gave in respect to all the other lands along its route. Whether this inchoate title was subject to be overridden and displaced by a subsequent designation of route under the prior grant to the Atlantic and Pacific Company, is quite another question. Doubtless it was; but this did not prevent the grant from attaching to the lands; indeed, it assumes that the grant did attach; for, otherwise it could not be displaced. The pretence, therefore, that the lands were excepted from the grant to the Southern Pacific Company must be dismissed.

If we test this asserted exception by the rules applicable to the construction of written grants, (4 Cruise Dig. 271,) it is at once manifest that it is no exception at all. (1) The first rule is that an exception must be created by apt words. This means that the words must import an intent to except some part of a thing previously granted from the operation of the grant. But these words disclose no such intent. (2) Another rule is that the thing excepted "must be part of the thing granted; for if the exception extends to the whole it will be void." But this so-called exception applies indifferently to the entire premises, and is as applicable to one part as another. (3) Another rule is that the thing excepted "must be certainly described and set down." This is only a formal statement of what common sense teaches; that a grant of premises must be certain in respect to the subject matter granted. It must be known, and known from the terms of the grant itself, what is intended to be conveyed by it, and what not. Otherwise it can never be executed, or any title given by it enforced. If it is attempted to exclude some part of the thing from the operation of the grant, that thing must be described so that it can be known. But how could it be told when the route of the Southern Pacific Company was located, what part of the lands to which it became attached was excluded by the prior grant to the Atlantic and Pacific Company, which was then a mere float, and might never be anything more.

If, turning aside from technical rules, we look at the situation at the time of the making of the grant to the Southern Pacific Company, and the probable purposes of Congress, the just conclusion concerning the meaning of this proviso, if, upon the face of it, a doubt could be indulged, will become very manifest. The proviso that the grant to the Southern Pacific Company should not "impair the rights, present or prospective, of the Atlantic and Pacific Company," neatly and perfectly accomplished the precise intent of Congress. It made the grant of lands to the former company immediately operative and capable of execution; but saved any rights of the latter company. If the latter company ever constructed its road, it would be entitled to the lands in the overlapping

limits. If it should not construct its road, there never would be any overlapping limits, and, therefore, no impediments in the way of the grant to the Southern Pacific Company.

(*e*) This attempted exception is sought to be supported upon another provision of the grant itself, namely, that found in section 3 of the act of July 27, 1866, providing, that in case the route should be found upon the line of any other road to which a land grant had theretofore been made, a déduction should be made of so much as had been previously granted from the amount granted by the later act, "so far as the routes are upon the same general line." This view seems wholly destitute of substance.

(*f*) The conclusion of this whole discussion of the attempt of the government to make out an exception in the grant to the Southern Pacific Company is, that the case is simply that of two grants which would, if the conditions of both had been complied with, have resulted in a conflict at a certain point. Had that collision arisen, the rival claims would have been at once determined by the inquiry which is the prior, and which is the later grant. The grant to the Southern Pacific Company was the later one in two ways: first, by the express language of the proviso; and, second, by the rule of interpretation that grants take effect from their dates, and not from the dates of location of routes.

But the conditions of the prior grant never having been complied with, there has been no collision. And that grant having been absolutely forfeited, no collision ever can take place. The later grant is the only existing one, and there is nothing in the way of its complete operation.

(*g*) A final illustration of the infirmity of the position of the government may be found by looking at its attitude as a complainant in these suits, seeking to establish in itself the legal title to the lands in controversy.

There are two aspects only in which it can maintain such a suit; (1), where it can succeed in showing that it has the right to both the legal and the equitable or beneficial titles; that is to say, where the lands belong to the general public domain, to be disposed of by the government as any absolute proprie-

tor might dispose of his lands for any purpose, sale, settlement, preëmption or oth⌐r; (2) where it needs the legal title in order to deal with it in conformity with some appropriation already made of the lands, which it is the duty of the government to carry out and perfect. *United States* v. *Missouri, Kansas & Texas Railway*, 141 U. S. 358, 368, 380. In neither of these aspects can these suits be maintained.·

(1) They cannot be in the first aspect, which, indeed, is the one in which they are avowedly brought. The United States have no beneficial interest in these lands. It intentionally parted with all that interest by the two grants which have been discussed.

(2) Nor can these suits be maintained in the second aspect. In the first place, it is enough to say that the government does not pretend to bring the suits in that aspect. It does not pretend that it needs the legal title in order that it may hold it and in due time convey it to the Atlantic and Pacific Company. It disclaims and repudiates that attitude. It asserts that that company has wholly forfeited its rights, and that it never will convey the lands to it. But even if it did not assert this, but affected to want the title in order to bestow it upon the Atlantic and Pacific Company, that would not alter the conclusion; for, whether the one or the other of these companies has the title, is a question between them, and to be settled by a suit between them, and not in a suit brought by the United States. ·

(*h*) The view taken by the government to the effect that these lands have been, in some manner, excepted from the grant to the Southern Pacific Company, either by reason of that grant being subsequent in date to the grant to the Atlantic and Pacific Company, or in consequence of the proviso, seems to have been supposed by some officers of the Land Department to be supported by the decisions of this court; and the supposal was acquiesced in, in an *obiter* fashion, though the assent was afterwards withdrawn, by the learned judge of the District Court. There is no such support for this view. On the contrary, the positions and the reasoning of this brief are fully sustained by a long series of decisions of

this court. *Missouri, Kansas & Texas Railway* v. *Kansas Pacific Railway,* 97 U. S. 491; *Kansas Pacific Railroad* v. *Atchison, Topeka &c. Railroad,* 112 U. S. 414; *St. Paul & Sioux City Railroad* v. *Winona & St. Peter Railroad,* Id. 720; *Sioux City & St. Paul Railroad* v. *Chicago, Milwaukee & St. Paul Railway,* 117 U. S. 406. See also *Schulenberg* v. *Harriman,* 21 Wall. 44; and *Van Wyck* v. *Knevals,* 106 U. S. 360; both cited by the counsel for the government. The doctrine declared by these cases is well stated in the opinion in the latter by the following language: " A third party cannot take upon himself to enforce conditions attached to the grant, when the government does not complain of their breach," p. 369.

V. The ground is taken by the complainants as to some of the lands in controversy, that they were not included within the grants, either to the Atlantic and Pacific or to the Southern Pacific Company, for the reason that they were within, not, indeed, the real limits, but within the claimed limits of the Mexican grant called San José. This ground of objection cannot be maintained.

If it were indeed true that the lands in question, or any of them, were at the time of the making of the grant to the Southern Pacific Company really within the limits of a Mexican grant, which was *sub judice,* as the phrase is, they would not pass by the grant — not for the reason that they were within any express exception, but because such grants are understood to be only of public lands; and it has been held that lands within the boundaries of a Mexican grant, not fully adjudicated upon, do not fall within the description of public lands, as those words are understood in the interpretation of grants, such as these, for the purpose of aiding in the construction of railroads.

But this proposition is not sufficient for the purposes of the complainants. It is admitted that none of the lands in controversy were actually within the boundaries of the Mexican grant called San José, as the same was confirmed and finally patented. What is alleged is, that they were within the claimed limits of that grant; that is to say, that there was at some time or other, before the final survey, which was had

after the final confirmation of the grant, a claim on the part of the grantees that the boundaries of the grant embraced a larger area than that for which the patent was issued, and included some of the lands in controversy.

The proposition, therefore, which the complainants must maintain, or their case in this respect wholly fails, is, not that lands within the boundaries of a Mexican grant do not belong to the category of public lands, but that lands outside of such boundary, as well as lands within it, are in like manner excluded from that category, provided that there is a claim that the lands are included within the boundaries of the grant. This proposition finds no support in reason or in the policy upon which the rule really established, as above mentioned, stands. *Newhall* v. *Sanger*, 92 U. S. 761; *Doolan* v. *Carr*, 125 U. S. 618; *United States* v. *McLaughlin*, 127 U. S. 428.

MR. JUSTICE BREWER delivered the opinion of the court.

The question to be considered is not as to the validity of the grant to the Southern Pacific Company, but only as to its extent. It may be conceded that the company took title to lands generally along its line, from Tehachapa Pass to its junction with the Texas Pacific; and the contention of the government is here limited to those lands only which lie within the granted limits of both the Atlantic and Pacific and the Southern Pacific Companies, at the crossing of their lines, as definitely located. As it appears from the record that, at the time of the location of the former company's line, so many of the tracts within these overlapping limits had been taken up by preëmption and homestead entries that the indemnity limits were not large enough to supply its deficiency, it is obvious that the land to be affected by this decision is of limited area in comparison with the large body of lands covered by the grant to the Southern Pacific.

The contention of the government is, that these lands were not included within the grant to the Southern Pacific. Such contention implies no want of good faith on its part. It is not attempting to take back or forfeit that which it has once

granted. It is only seeking, a difference of opinion having arisen, an adjustment, a determination of the extent of its grant. Less than that could not be expected; more than that could not be asked of it.

The grants to both the Atlantic and Pacific and the Southern Pacific Companies were grants *in præsenti*. The language is, "there be, and hereby is, granted." The construction and effect of such words of grant have often been considered by this court. In the recent case of *St. Paul and Pacific Railroad Company* v. *Northern Pacific Railroad Company*, 139 U. S. 1, 5, Mr. Justice Field, speaking for the court, said: "As seen by the terms of the third section of the act, the grant is one *in præsenti*; that is, it purports to pass a present title to the lands designated by alternate sections, subject to such exceptions and reservations as may arise from sale, grant, preëmption or other disposition previous to the time the definite route of the road is fixed. The language of the statute is, 'that there be, and hereby is, granted' to the company every alternate section of the lands designated, which implies that the property itself is passed, not any special or limited interest in it. The words also import a transfer of a present title, not a promise to transfer one in the future. The route not being at the time determined, the grant was in the nature of a float, and the title did not attach to any specific sections until they were capable of identification; but when once identified the title attached to them as of the date of the grant, except as to such sections as were specifically reserved. It is in this sense that the grant is termed one *in præsenti*; that is to say, it is of that character as to all lands within the terms of the grant, and not reserved from it at the time of the definite location of the route. This is the construction given to similar grants by this court, where the question has been often considered; indeed, it is so well settled as to be no longer open to discussion. *Schulenberg* v. *Harriman*, 21 Wall. 44, 60; *Leavenworth, Lawrence &c. Railroad Co.* v. *United States*, 92 U. S. 733; *Missouri, Kansas &c. Railway Co.* v. *Kansas Pacific Railway Co.*, 97 U. S. 491; *Railroad Co.* v. *Baldwin*, 103 U. S. 426. The terms of present grant are in some cases qualified by

other portions of the granting act, as in the case of *Rice* v. *Railroad Co.*, 1 Black, 358; but unless qualified they are to receive the interpretation mentioned."

In view of this late and clear declaration, it would be a waste of time to attempt a reëxamination of the questions, or a restatement of the reasons which have established these as the settled rules of law in respect to land grants, and made it so that the old common law rule as to the necessity of identification to a conveyance has not been controlling in determining the scope and effect of a Congressional land grant. Yet reference may be had to the still later case of *Bardon* v. *Northern Pacific Railroad*, 145 U. S. 535, in which the doctrine that title passes by relation as of the date of the grant was held to exclude from a grant land which, at the date of the act, was held under a homestead claim, although the claim had been abandoned, and the land restored to the public domain before the filing of the map of definite location. It may also not be amiss to notice the case of *Schulenberg* v. *Harriman*, 21 Wall. 44. In that case land had been granted to the State of Wisconsin, to aid in the construction of a railroad. The language of the grant was like that in this: "There be, and is hereby, granted." A further provision was that if the road be not completed within ten years, "no further sales shall be made, and the lands unsold shall revert to the United States." The railroad was not completed within the time specified. Thereafter timber was cut and removed from these lands, and the question for consideration was as to the ownership of that timber. It was held that the timber was the property of the State; that by the grant, title to the land passed to the State upon the location of the route; and that, though the road was not completed within the time specified, and though there was the provision that the unsold lands should revert, yet the title still remained in the State, held under a condition subsequent, and held until the government should take some steps to assert a forfeiture.

Applying these well-settled rules to the cases at bar, there can be little difficulty in arriving at a conclusion. The grant to the Atlantic and Pacific was made in 1866; to the Southern

Pacific in 1871. They were grants *in præsenti*. When maps of definite location were filed and approved, the grants severally took effect by relation as of the dates of the acts. The map of definite location of the Atlantic and Pacific Company's road along the lands in controversy was filed and approved on April 11, 1872. Then the specific tracts were designated, and to them the title of the Atlantic and Pacific attached as of July 27, 1866. If anything in the land laws of the United States can be considered as thoroughly settled by repeated decisions, it is this. It matters not when the map of definite location of the Southern Pacific was filed and approved, whether before or after April 11, 1872; for when filed the grant could take effect by relation only as of March 3, 1871, and at that time, and for nearly five years theretofore, the title to these lands had been in the Atlantic and Pacific. It matters not that the act of 1871 in terms purports to bestow the same rights, grants and privileges as were granted to the Southern Pacific Railroad Company by the act of 1866. That merely defines the extent of the grant and the character of the rights and privileges; it does not operate to make the latter grant take effect by relation as of the date of the prior grant, and thus subject the grants to the two companies to the rule controlling cotemporaneous grants, as established by *St. Paul & Sioux City Railroad* v. *Winona & St. Peter Railroad,* 112 U. S. 720, and *Sioux City & St. Paul Railroad* v. *Chicago, Milwaukee &c. Railway,* 117 U. S. 406. Even if Congress had in terms expressed an intent to that effect in a subsequent act, it was not competent, by such legislation, to divest the rights already vested in the Atlantic and Pacific Company. So the case, in the best way of putting it for the defendant, is the case of two companies with conflicting grants, each of whose line of definite location has been approved by the Land Department. Unquestionably, the grant older in date takes the land.

Some stress seems to have been laid in the court below on the proviso to the act of 1871, which reads: "Provided, however, that this section shall in no way affect or impair the rights, present or prospective, of the Atlantic and Pacific

Railroad Company, or any other railroad company." But the language of this proviso is negative and restrictive, and not affirmative and enlarging. It says substantially that nothing in the grant to the Southern Pacific shall affect or impair other grants. Surely the declaration that this grant does not affect some other grant, does not make this grant any larger than it would have been without that declaration. It simply prevents it from having any effect, which, but for the declaration, it might be supposed to have on something else. If without those words it could take nothing granted to the Atlantic and Pacific, *a fortiori* with them it takes nothing.

But it is urged by counsel for defendant that no map of definite location of line between the Colorado River and the Pacific Ocean was ever filed by the Atlantic and Pacific or approved by the Secretary of the Interior. This contention is based upon these facts: The Atlantic and Pacific Company claimed that, under its charter, it was authorized to build a road from the Colorado River to the Pacific Ocean, and thence along the coast up to San Francisco; and it filed maps thereof in four sections. San Buenaventura was the point where the westward line first touched the Pacific Ocean. One of these maps was of that portion of the line extending from the western boundary of Los Angeles County, a point east of San Buenaventura, and through that place to San Miguel Mission, in the direction of San Francisco. In other words, San Buenaventura was not the terminus of any line of definite location from the Colorado River westward, whether shown by one or more maps, but only an intermediate point on one sectional map. When the four maps were filed, and in 1872, the Land Department, holding that the Atlantic and Pacific Company was authorized to build not only from the Colorado River directly to the Pacific Ocean, but also thence north to San Francisco, approved them as establishing the line of definite location. Subsequently, and when Mr. Justice Lamar was Secretary of the Interior, the matter was reëxamined, and it was properly held that under the act of 1866, the grant to the Atlantic and Pacific was exhausted when its line reached the Pacific Ocean. San Buenaventura was, therefore, held to be

the western terminus, and the location of the line approved to that point.   The fact that its line was located, and maps filed thereof in sections, is immaterial.   *St. Paul & Pacific Railroad* v. *Northern Pacific Railroad,* 139 U. S. 1.   Indeed, all the transcontinental roads, it is believed, filed their maps of route in sections.   So the question is whether the filing a map of definite location from the Colorado River through San Buenaventura to San Francisco, under a claim of right to construct a road the entire distance, is good as a map of definite location from the Colorado River to San Buenaventura, the latter point being the limit of the grant.   We think, unquestionably, it is.   Though a party claims more than he is legally entitled to, his claim ought not to be rejected for that to which he has a right.   The purpose of filing a map of definite location is to enable the Land Department to designate the lands passing under the grant; and when a map of such a line is filed, full information is given, and, so far as that line may legally extend, the law perfects the title.   It surely cannot be that a company must determine at its peril the extent to which its grant may go, or that a mistake in such determination works a forfeiture of all its rights to lands.

In this connection, reference may be had to the contention of the Southern Pacific Company, that it filed its map of definite location on April 3, 1871, more than a year before the filing of its map by the Atlantic and Pacific Company; that, therefore, its title then attached to these lands, the same as to any other lands along its line; and that, if such title was displaced by any subsequent filing of the Atlantic and Pacific Company's map, it was only conditionally displaced; that is, displaced on condition that the Atlantic and Pacific Company should, by the final completion of its road, perfect its right thereto.   But whatever title or right the Southern Pacific Company might acquire by a prior filing of its map was absolutely displaced when the Atlantic and Pacific Company's map was filed.   Illy as it may accord with the common law notions of identification of tracts as essential to a valid transfer of title, it is fully settled that we are to construe these acts of Congress as laws as well as grants; that

Congress intends no scramble between companies for the grasping of titles by priority of location, but that it is to be regarded as though title passes as of the date of the act, and to the company having priority of grant, and, therefore, that in the eye of the law it is now as though there never was a period of time during which any title to these lands was in the Southern Pacific. As said in the case of *Missouri, Kansas & Texas Railway* v. *Kansas Pacific Railway,* 97 U. S. 491, 497:

"It is always to be borne in mind, in construing a Congressional grant, that the act by which it is made is a law as well as a conveyance, and that such effect must be given to it as will carry out the intent of Congress. That intent should not be defeated by applying to the grant the rules of the common law, which are properly applicable only to transfers between private parties. To the validity of such transfers it may be admitted that there must exist a present power of identification of the land; and that where no such power exists, instruments, with words of present grant, are operative, if at all, only as contracts to convey. But the rules of the common law must yield in this, as in all other cases, to the legislative will."

So now, whatever may have been the dates of filing by the respective companies, the case stands as though the lands granted to the Atlantic and Pacific had been identified in 1866, and title had then passed, and there never was a title of any kind vested in the Southern Pacific Company.

And whatever of plausibility there might be in this suggestion of counsel, based upon the old common law rules in respect to the effect of a lack of identification upon attempted conveyances between private parties, it fails entirely because its map of definite location was not filed by the Southern Pacific Company until long after the filing by the Atlantic and Pacific Company. It is true that the bills of complaint in these cases allege that "said Southern Pacific Railroad Company accepted said grant, and on April 3, 1871, did designate the line of its said road by a plat thereof, which it on that day filed in the office of the Commissioner of the General

Land Office, and did construct and complete said road in the manner and within the time prescribed, except that it did not connect with the Texas and Pacific Railroad, and on April 3, 1871, the odd sections of public land for thirty miles in width on each side of said route, to which the United States had full title, not reserved, sold, granted, appropriated and free from all claims and rights, were, by the Department of the Interior, ordered withdrawn from sale and entry and reserved."

This allegation apparently refers by its terms to the line of definite location, as provided for in section 3 of the act of July 27, 1866, inasmuch as it uses the words of that section, to wit, "at the time the line of said road is designated by a plat thereof." And if this were a matter vital to the case, it might be necessary to require that the bill be amended to conform to the proof, though it may be remarked that the allegations in the last part of the clause quoted, in respect to the withdrawal of lands, seem to indicate that the map of general route rather than that of definite location was referred to.

The distinction between the line of definite location and the general route is well known. It was clearly pointed out in the case of *Buttz* v. *Northern Pacific Railroad Co.*, 119 U. S. 55. The act under consideration in that case was that of July 2, 1864, 13 Stat. 365, making a grant to the Northern Pacific Railroad Company. The third section of that act, as the third of this, made the grant, and provided for the line of definite location. Section 6 authorized the fixing of the general route, and its language in respect to that matter is the same as that of section 6 of the act before us. It reads: "That the President of the United States shall cause the lands to be surveyed for forty miles in width on both sides of the entire line of said road, after the general route shall be fixed, and as fast as may be required by the construction of said railroad; and the odd sections of land hereby granted shall not be liable to sale or entry," etc. Referring to this matter, it was said in the opinion in that case, on pages 71 and 72: "The act of Congress not only contemplates the filing by the company, in the office of the Commissioner of

the General Land Office, of a map showing the definite location of the line of its road, and limits the grant to such alternate odd sections as have not, at that time, been reserved, sold, granted or otherwise appropriated, and are free from preëmption, grant or other claims or rights; but it also contemplates a preliminary designation of the general route of the road, and the exclusion from sale, entry or preëmption of the adjoining odd sections within forty miles on each side, until the definite location is made. . . . The general route may be considered as fixed when its general course and direction are determined after an actual examination of the country or from a knowledge of it, and is designated by a line on a map showing the general features of the adjacent country and the places through or by which it will pass. The officers of the Land Department are expected to exercise supervision over the matter so as to require good faith on the part of the company in designating the general route, and not to accept an arbitrary and capricious selection of the line irrespective of the character of the country through which the road is to be constructed. When the general route of the road is thus fixed in good faith, and information thereof given to the Land Department by filing the map thereof with the Commissioner of the General Land Office, or the Secretary of the Interior, the law withdraws from sale or preëmption the odd sections to the extent of forty miles on each side. The object of the law in this particular is plain; it is to preserve the land for the company to which, in aid of the construction of the road, it is granted. Although the act does not require the officers of the Land Department to give notice to the local land officers of the withdrawal of the odd sections from sale or preëmption, it has been the practice of the Department in such cases, to formally withdraw them."

As the act of July 27, 1866, the one before us, is in these respects exactly like that of the one before the court in that case, it must be held that here, as there, Congress provided for two separate matters; one the fixing of the general route, and the other the designation of the line of definite location; and an examination of the evidence shows that the map which

was filed on April 3, 1871, was simply one of general route, and therefore did not work a des gn tion of the tracts of land to which the Southern Pacific's grant attached. As the map was filed within one month after the grant, it might be inferred that there had not been sufficient time to fix the line of definite location, though, of course, it would be possible, as counsel suggests, that the company had surveyed the line in anticipation of the grant, and the matter of time would not be decisive. But turning to the map itself, a copy of which is in evidence, we find that this is the certificate made thereon by the Southern Pacific Company:

To Hon. C. Delano, Secretary of the Interior, and Hon. Willis Drummond, Commissioner of General Land Office:

"Please to take notice that this map is filed by the Southern Pacific Railroad Company, of California, in the office of the Commissioner of the General Land Office, in the Department of the Interior, for the purpose of designating by the heavy red line traced thereon the general route of the line of railroad, as near as may be, from a point at or near Tehachapa Pass, by way of Los Angeles to the Texas Pacific. Railroad at or near the Colorado River, adopted by the said Southern Pacific Railroad Company in pursuance of the power and authority granted to said company by the 23d section of the act of Congress of the United States, entitled 'An act to incorporate the Texas Pacific Railroad Company, and to aid in the construction of its road, and for other purposes,' approved March 3, 1871, and in pursuance of the provisions of the act of July 27, 1866, referred to in said 23d section, and for the purpose of obtaining the benefit of the provisions of said acts of Congress.

"CHAS. CROCKER,
"*President, Southern Pacific Railroad Company.*"

Not only that, but upon the filing of the map, and on April 21, 1871, the Commissioner of the General Land Office sent to the receiver at Los Angeles a letter making a direction of withdrawal, in which he says, referring to this matter: "The com-

pany having filed a diagram designating the general route of said road, I herewith transmit a map showing thereon the line of route, as also the 20 and 30-mile limits of the grant, to the line of withdrawal for the Southern Pacific Railroad under the act of 1866, and you are hereby directed to withhold from sale or location, preëmption or homestead entry all the odd-numbered sections falling within those limits."

Further, there is in evidence an exemplification of a diagram in the Land Office, showing the limits of the grant to the Atlantic and Pacific Company, with the intersecting limits of the grant to the Southern Pacific Company, on which diagram appear two lines, one traced in blue, and marked "branch of the Southern Pacific Railroad;" and the other in red, somewhat divergent therefrom, marked "Southern Pacific Railroad, definite location." Still further, on the minutes of the proceedings of meetings of the directors of the Southern Pacific road, held on April 10, September 8, and October 1, 1874, appear resolutions similar in their character, but having reference to different parts of the line between Tehachapa Pass and the Texas Pacific Railroad.

The one passed at the meeting on April 10, 1874, is in these words:

"*Resolved*, That the line of railroad as it has been surveyed and laid out on map marked 'A.A,' and described as follows: Commencing at a point in the northwest quarter (N.W. $\frac{1}{4}$) of section [three] (3), township two (2) north, range fifteen (15) west, San Bernardino base and meridian, and running thence in a southeasterly direction to the city of Los Angeles, and thence in an easterly direction to a point in the northeasterly quarter (N.E. $\frac{1}{4}$) of section twenty-seven (27), township one (1) south, range nine (9) west, San Bernardino base and meridian, being map and profile of section No. one, Southern Pacific Railroad and telegraph line authorized by the twenty-third section of the Texas Pacific Railroad act, approved March 3d, 1871, be and the same is hereby, adopted as the route of said railroad between the points named

"(Signed)     J. L. WILLCUTT, *Secty.*"

So, only at these late days was the line of definite location determined upon by the company. Of course, therefore, the map filed April 3, 1871, could not have been a map of that line, but was, as it states, only of the general route, and there was then no designation of lands to which the Southern Pacific Company's title could attach.

On the other hand, the Atlantic and Pacific Company did file its maps of definite location. This appears from the certificates thereon. In the one covering the line along the lands in controversy, the chief engineer of the company certifies that E. N. Robinson was a deputy engineer, and that the latter, "as shown by his field-notes, did actually survey and mark upon the ground, or cause to be surveyed and marked upon the ground, the line or route of the Atlantic and Pacific Railroad," etc., as delineated upon the map; and that his acts in the premises were duly approved and accepted on behalf of the company, by himself as chief engineer. And in the further official certificate of the company it is stated that the "map shows the line or route of the said Atlantic and Pacific Railroad in the county, . . . being a part of the line or route of said railroad, as definitely fixed in compliance with said acts of Congress," etc. These maps were received and approved by the Land Department as maps of definite location. It follows that in fact the line of definite location of the Atlantic and Pacific was established, and maps thereof filed and approved before any action in that respect was taken by the Southern Pacific Company. There never was a time, therefore, at which the grant of the Southern Pacific could be said to have attached to these lands; and the plausible argument based thereon, made by counsel in behalf of the Southern Pacific Company, falls to the ground.

Again, it is urged that the grant to the Atlantic and Pacific having been forfeited, there is nothing now in the way of the Southern Pacific's grant attaching to these lands; that in the interpretation of rights under land grants, regard has always been had by this court to the intention of Congress; that it was the intention of Congress that these lands should pass to some company to aid in the construction of a railroad, either

the Atlantic and Pacific or the Southern Pacific; that they cannot now be applied to aid in the construction of the former company's road; and that, therefore, to carry into effect the intent of Congress, they should be applied to aid in the construction of the latter company's line. We think this contention is erroneous, both as to the law and the intent of Congress. It was held in the case of *Kansas Pacific Railway* v. *Dunmeyer*, 113 U. S. 629, that, where a homestead right had attached to a tract at the time of the definite location of the railway company's line, which homestead was afterwards abandoned, the tract was simply restored to the public domain, and did not pass to the railway company under its grant; that the grant only attached to lands which were the subject of grant at the time; and that the company had no interest in the question as to what afterwards became of a tract which was not public land at the time its grant became fixed. On page 644 the court observed: "The right of the homestead having attached to the land it was excepted out of the grant as much as if in a deed it had been excluded from the conveyance by metes and bounds." The same doctrine was affirmed in *Hastings and Dakota Railroad* v. *Whitney*, 132 U. S. 357; *Sioux City &c. Land Co.* v. *Griffey*, 143 U. S. 32; *Bardon* v. *Northern Pacific Railroad*, 145 U. S. 535.

Neither can it fairly be said that it was the intent of Congress that these lands should pass conditionally to the Southern Pacific Company. Good faith must be imputed to Congress. It cannot be supposed that Congress intended to give to the Southern Pacific Company that which it had already given to the Atlantic and Pacific Company. It knew that it had granted lands to the Atlantic and Pacific for a road to the Pacific Ocean, and that that company was then engaged in constructing its road, and proceeding with as much rapidity as other Pacific companies had done. Within little over a month from the date of this grant to the Southern Pacific Company, and on April 20, 1871, it gave to the Atlantic and Pacific Company authority to issue bonds secured by a mortgage on its road, equipment, lands, franchises, privileges, etc. 17 Stat. 19, c. 33. Congress, therefore, was expecting that the Atlantic

and Pacific Company would construct its road, and, with this expectation, had no thought of giving to the Southern Pacific Company that which it had already given to the Atlantic and Pacific Company.

Further, as indicating the intent of Congress, reference may be had to the first proviso to section 3 of the act of 1866, which, by the terms of section 18 of that act and the act of 1871, becomes one of the conditions of the grant to the Southern Pacific Company. That proviso is: "*Provided*, That if said route shall be found upon the line of any other railroad route, to aid in the construction of which lands have been heretofore granted by the United States, as far as the routes are upon the same general line, the amount of land heretofore granted shall be deducted from the amount granted by this act." That proviso may not be technically and strictly applicable to this case, in that a road crossing another may perhaps not be said to be found upon the line of such other road, or to be upon the same general line, yet the import of this proviso is clear, to the effect that Congress was not only not intending to give to one company that which it had already given to another, but intended that lands previously granted should be definitely excepted from the later grant.

Not only that, but by section 9 of the original act it was provided "that if the Atlantic and Pacific make any breach of the conditions hereof, and allow the same to continue for upwards of one year, then, in such case, at any time hereafter, the United States may do any and all acts and things which may be needful and necessary to insure a speedy completion of the said road." In other words, the intent of Congress was that this road to the Pacific should be built; that if there was any delay on the part of the Atlantic and Pacific Company, it might itself take all needful and necessary measures to accomplish the building; and to that end of course, use all the lands it proposed to grant therefor. Can it be supposed that this purpose of Congress was forgotten, or that its intent was changed when it made the grant to the Southern Pacific, or that it had anything in contemplation other than that, after the completion of the Atlantic and Pacific road, and the

appropriation of the lands along its line to aid in that construction, the Southern Pacific Company might, if it saw fit to build a road from Tehachapa Pass to the Texas and Pacific Railroad, obtain the remainder of the lands along that line?

Indeed, the intent of Congress in all railroad land grants, as has been understood and declared by this court again and again, is that such grant shall operate at a fixed time, and shall take only such lands as at that time are public lands, and, therefore, grantable by Congress, and is never to be taken as a floating authority to appropriate all tracts within the specified limits which at any subsequent time may become public lands. The question is asked, supposing the Atlantic and Pacific Company had never located its line west of the Colorado River, would not these lands have passed to the Southern Pacific Company under its grant? Very likely that may be so. The language of the Southern Pacific Company's grant is broad enough to include all land along its line and if the grant to the Atlantic and Pacific Company had never taken effect, it may be that there is nothing which would interfere with the passage of the title to the Southern Pacific Company.

But that is a matter of result from the happening of something neither intended nor expected. While it may have been within the knowledge of Congress as among the possibilities, that result was not the purpose sought to be accomplished by this legislation. If any other than the general rule as to land grants had been intended, it is to be expected that such intention would have been clearly expressed. So when intent is to be considered, the question is whether Congress intended, the title having once vested in the Atlantic and Pacific, that the Southern Pacific Company should stand waiting to take the lands at some future time, however distant, when the Atlantic and Pacific Company's title should fail.

Again, there can be no question, under the authorities heretofore cited, that, if the act of forfeiture had not been passed by Congress, the Atlantic and Pacific could yet construct its road, and that, constructing it, its title to these lands would become perfect. No power but that of Congress could interfere with this right of the Atlantic and Pacific. No one but

the grantor can raise the question of a breach of a condition subsequent. Congress, by the act of forfeiture of July 6, 1886, determined what should become of the lands forfeited. It enacted that they be restored to the public domain. The forfeiture was not for the benefit of the Southern Pacific; it was not to enlarge its grant as it stood prior to the act of forfeiture. It had given to the Southern Pacific all that it had agreed to in its original grant; and now, finding that the Atlantic and Pacific was guilty of a breach of a condition subsequent, it elected to enforce a forfeiture for that breach, and a forfeiture for its own benefit.

Our conclusions, therefore, are, that a valid and sufficient map of definite location of its route from the Colorado River to the Pacific Ocean was filed by the Atlantic and Pacific Company, and approved by the Secretary of the Interior; that by such act the title to these lands passed, under the grant of 1866, to the Atlantic and Pacific Company, and remained held by it subject to a condition subsequent until the act of forfeiture of 1886; that by that act of forfeiture the title of the Atlantic and Pacific was retaken by the general government, and retaken for its own benefit, and not that of the Southern Pacific Company; and that the latter company has no title of any kind to these lands.

*The decrees of the Circuit Court must be reversed, and the cases remanded with instructions to enter decrees for the plaintiff for the relief sought.*

MR. JUSTICE FIELD, (with whom concurred MR. JUSTICE GRAY,) dissenting.

I am not able to agree with the court in its judgment in these cases or in the reasons offered in its support.

The cases were fully and elaborately considered by the Circuit and District Judges in the court below. 46 Fed. Rep. 683, 692. Their opinions are not only able and convincing, but lead to conclusions which seem to me consonant with justice and fair dealing. To my sense of right, there is something repugnant in any other conclusion, in view of the

inducements held out by the government and the work done, and the expenses incurred, by the railroad company.

Congress desired to connect by a railway the States on the Mississippi with the Pacific Coast, and for that purpose, by the act of July 27, 1866, created a corporation known as the Atlantic and Pacific Railroad Company, and gave it a grant of lands to aid in the construction of a railway between Springfield, in the State of Missouri, and the Pacific Coast. 14 Stat. 292, c. 278. The 18th section authorized the Southern Pacific Railroad Company, a corporation under the laws of California, to connect with the Atlantic and Pacific Railroad at such point near the boundary line of California which it should deem most suitable for a railroad line to San Francisco, and in consideration thereof, and to aid in its construction, gave it grants of lands similar to those which the Atlantic and Pacific Railroad Company had received and subject to the same conditions and limitations.

On the 3d of March, 1871, Congress passed an act to incorporate the Texas and Pacific Railroad Company, and to aid in the construction of its road; and, for the purpose of connecting that road with the city of San Francisco, it authorized, by its 23d section, the Southern Pacific Railroad Company to construct a line of railroad from a point at or near Tehachapa Pass, by way of Los Angeles, to the Texas Pacific Railroad at or near the Colorado River, with the same rights, grants and privileges, and subject to the same limitations, as those contained in the grant by the act of July 27, 1866, with a proviso "that this section shall in no way affect or impair the rights, present or prospective, of the Atlantic and Pacific Railroad Company, or any other railroad company." On the 3d of April following, one month only after the passage of this act, the Southern Pacific Company designated the line of its road from Tehachapa Pass, by way of Los Angeles to Fort Yuma on the Colorado River, on a map which it filed on that day in the office of the Commissioner of the General Land Office. Afterwards the Southern Pacific was amalgamated or consolidated with other companies, the consolidated company being called the Southern Pacific Railroad Company. It then proceeded to

build the railroad along the line designated from Tehachapa Pass, by way of Los Angeles, to the Colorado River, and completed the same within the time required by the act of Congress. Its several sections were examined from time to time and reported to the President of the United States, by commissioners appointed by him for that purpose; and the whole line was accepted by the President, and patents of the United States for the greater part of the lands thus earned were issued to the company.  Ever since the completion and acceptance of the road the company has performed to the satisfaction of the government all the services, such as carrying the mails; transporting troops and supplies, in all respects as required by the act of Congress; and the services have been accepted by the United States.

The Atlantic and Pacific Railroad Company subsequently to this definite location of the Southern Pacific Company, and nearly a year after the construction of its road had been commenced, and on March 12, 1872, filed in the office of the Secretary of the Interior — not the office of the Commissioner of the General Land Office — two maps of portions of the line of road in the State of California, and some time afterwards filed maps of other portions of its line, but it never constructed any portion of the road authorized to be constructed by it in the State of California; and for its failure in that respect, Congress, on July 6, 1886, passed an act declaring a forfeiture of the land in that State.  The proposed line of the Atlantic and Pacific Railroad, which was never built, crosses the line of the road of the Southern Pacific Company, which was built as stated.

The present suit is brought to cancel the patents issued to the Southern Pacific Company, and, wherever there is any portion for which a patent has not been issued, to annul its alleged title.

The opinion of the majority of the court proceeds upon the ground that the grant to the Atlantic and Pacific Railroad Company, though the road in aid of which it was granted was never constructed, and the grant was subsequently forfeited by the United States, operated to divest the government of

the fee of such lands so completely that the grant to the Southern Pacific Company to build its road could in no way be carried out; that its action, although taken with the approval of the officers of the government and strictly in conformity with its grant, gave nothing whatever to that company, and that the United States are for that reason authorized to ask for the cancellation of the patents and the surrender of the lands granted, necessarily carrying with them the railroad and other works constructed by the company. And this is prayed in the face of the evident intention of Congress that the Southern Pacific Company should have these identical lands, so far as the government had the right to grant them as its reward in part for building the road.

It is not denied or doubted, as counsel well observed, that the Southern Pacific Company "promptly, completely, in good faith and to the satisfaction of every department of the government having any concern with the matter, constructed and equipped its road, put it into operation and placed in possession of the government every facility and advantage sought by it in making the grants, and has thus fully earned its entire reward. And yet, in the face of all this, the government, by these suits, seeks to wrest these lands from the company, not because it wishes to apply them to some purpose of its own to which they had been devoted prior to the grant, nor because it needs them in order to enable it to fulfil some prior engagement with other parties, but simply in order to restore them to the public domain, where they were at the time of the grant, in order that it may deal with them as its own absolute property, and as it pleases." The cases would thus seem to be destitute of any substantial equity.

The opinion assumes that the grant to the Atlantic and Pacific Company when its map of definite location was filed, though that was after the concession to the Southern Pacific Company, took effect and vested an absolute title to the lands designated in the Atlantic and Pacific Company from its date, which could not be affected by any subsequent events which would make the concession to the Southern Pacific available. In support of that view it cites several decisions of the court,

in which it has been held that similar railroad grants were grants *in præsenti*, and operated only upon lands at the time free from exceptions stated, such as lands to which a preemption or homestead right has attached, or have been reserved for special purposes, and that lands thus excepted or reserved do not fall under the operation of the grants if subsequently the cause of the original exception or reservation has ceased, but remain as public or ungranted lands.

Such grants have been treated as grants *in præsenti* in determining controversies between parties as to the date of their respective titles under the grants, or against conflicting grants. They are grants *in præsenti*, so as to cut off all intervening claims except such as are expressly named; and if the work, in aid of which the grants are made, is executed in accordance with their provisions, the title of the grantees will take effect as of their date, except as to specially reserved parcels. We do not disagree with the majority of the court on this point. It is true, also, that lands excepted or reserved from such grants at their date are not subsequently brought under their operation if the cause or purpose of their exception ceases. They remain ungranted lands. Such was the case of *Bardon* v. *Northern Pacific Railroad Company*, 145 U. S. 535. But it is evident that such exceptions and reservations of one grant do not apply and control a second grant, unless such second grant is specially stated to be within them. When the second grant in question in this case was made, all the rights which the United States had in the lands described therein passed to the Southern Pacific Company, subject only to the rights specially reserved of the first grantee, and released of all restrictions upon their use except as thus designated. Until something was done under the first grant towards its execution, it was competent for Congress to give effect to other grants and to limit the extent of their subordination.

Neither grants *in præsenti*, nor grants with special exceptions or reservations, have ever been held, that I am aware of, to prohibit a second grant of the same lands subject to the condition that it shall not affect or impair any rights

under the elder grants.    There can be no circumstances under which such second conditional grant may not be made. Whether it will ever become operative and pass the title to the lands described will depend upon circumstances which cannot be stated with certainty in advance.    Many events may arise to defeat or limit the operation of the first grant. It may be forfeited, or portions of its lands may be surrendered and new legislation, taken in execution of the reserved power to alter, amend or repeal the act making the grant, may change the whole condition of the lands.

From these views it would seem that the questions arising in this case should not be difficult of solution.    Before anything was done under the grant to the Atlantic and Pacific Railroad Company, even to indicate the route of the road it would construct, authority was issued by the government to the Southern Pacific Company to build a road north from a point at or near Tehachapa Pass, by way of Los Angeles, to the Texas and Pacific Railroad at or near the Colorado River, with a proviso, however, that the authority thus given should not in any respect impair the rights, present or prospective, of the Atlantic and Pacific Railroad Company or of any other railroad.    Congress had power to confer such authority and to make a grant for its execution.    Surely Congress can make a grant of lands which it owns or claims to own at any time, if it annex a condition that the grant shall not affect or impair the rights of a previous grantee.    It would, as it seems to me, be an extravagant and utterly unwarranted assertion to say that Congress, having made a grant for a railroad to run in one direction, is thereby prohibited from making another grant for a railroad to run in a different direction, if a condition is annexed that the second grant shall not affect or impair the rights of the first grantee.    The questions, and the only questions for consideration in such a case, would be, first, what are the rights thus reserved to which the second grant is subordinate, and, second, have they been affected or impaired by the later grant?    The previous grant to the Atlantic and Pacific Railroad Company, made six years before, did not stand in the way of Congress making the conditional con-

cession to the Southern Pacific. If unlimited, it would have affected the extent of the grant to the first company. A limitation upon its operation was placed by the proviso. No line of railroad had been then defined or marked by the Atlantic and Pacific Railroad Company. It might, so far as Congress saw, have selected a different route from the one it did afterwards select. Congress waited six years for that company to make a selection before it made the concession to the Southern Pacific Company. The company was not bound to wait indefinitely for the years to elapse before moving in the enterprise it was to undertake, and to further which Congress had afforded assistance. The condition attached to the concession was not an exception from the grant of any lands that the Atlantic and Pacific Railroad Company might claim under its grant without performing its conditions. It merely rendered the concession to the Southern Pacific Company subordinate and subject to any rights that the Atlantic and Pacific Company may then have acquired or might thereafter acquire under its grant, upon the performance of its conditions. What, then, were those rights, present or prospective, which were reserved to the Atlantic and Pacific Company? Plainly they were the right to construct a railroad and telegraph to the Pacific Coast, from the Colorado River, by the most practicable route, with a right of way two hundred feet in width, and to use certain lands granted for that purpose to aid in their construction, and, when constructed, the right to operate the road and use the telegraph line. They were permissive rights, and not compulsory. Have they been affected or impaired by the concession to the Southern Pacific Company? In no respect whatever. They were affected and impaired by the company's failure to perform the conditions annexed to its grant, and in no other way, until its forfeiture was declared. It never did anything towards a compliance with its conditions except to file, in detached parts, what it termed a map of the location of its road six years after the date of the grant and one year after the Southern Pacific Company had located its road, under its concession, and commenced its construction. Its rights, whether present or prospective were never invoked,

and, in consequence, nothing was, ever obtained in virtue of them. The building of another road in another direction by the Southern Pacific Company under its concession did not, therefore, affect or impair any rights of the Atlantic and Pacific, as none were ever claimed or exercised by it. Had the company performed the conditions of its grant and exercised its rights it would have taken the lands under the grant against any possible pretension of the Southern Pacific Company; but, having abandoned all such rights by simply refusing to do anything, the Southern Pacific Company rightly proceeded with its work and constructed its road. The grant to it was a full conveyance of all the rights of the United States free from all restraints except as specially designated, and the rights then reserved were never subsequently affected or impaired by the Southern Pacific Company, and they were lost entirely by the forfeiture of the grant.

The case, in a nutshell, is this: The grant to the Atlantic and Pacific Railroad Company was indeed prior in point of time and of right, and the grant to the Southern Pacific Railroad Company was subordinate to the prior grant. But when the prior grant was forfeited by the failure of the Atlantic and Pacific Railroad Company to perform its conditions, that grant fell off, and the underlying grant to the Southern Pacific Railroad Company, all the conditions of which had been performed, remained in full force and effect.

I consider the principle involved in these cases as one of great importance, more so than the value of the property, although that runs into millions of dollars, expended by the company upon the encouragement of the government. But it is infinitely more important that it should be established that the government and its officers are bound by the same principles of justice in their dealings which are held to govern the conduct of individuals.

In my opinion the judgment of the court below should be affirmed, and I am authorized to state that MR. JUSTICE GRAY concurs with me in this dissent.