# WERLING *v.* INGERSOLL.

ERROR TO THE SUPREME COURT OF THE STATE OF ILLINOIS.

No. 168.   Argued and submitted March 6, 1901.—Decided April 15, 1901.

When Congress, under the act of March 2, 1827, granted to the State of Illinois alternate sections of land throughout the whole length of the public domain, in aid of the construction of a canal to connect the waters of the Illinois River with those of Lake Michigan, it also granted by implication the right of way through reserved sections; but this implication would not extend to ninety feet on each side.

The State of Illinois never took title to a strip of land ninety feet wide on each side of the route of that canal through the public lands, so far as related to the sections reserved to the United States by the act of March 2, 1827.

The State, in constructing the canal, proceeded under that act, filed its map thereunder, and constructed the canal with reference thereto.

THE plaintiffs in error have brought this case here to review the final judgment of the Supreme Court of the State of Illinois affirming the judgment of the circuit court of La Salle County in favor of the defendants in error (plaintiffs below) in an action of trespass involving the title to lands in that county on the south side of the Illinois and Michigan Canal. The action was brought for the purpose of testing the title and was tried by the court upon an agreed statement of facts, a jury being waived. It appears from this statement that the plaintiffs in error are the agents of the State of Illinois and acted as such in taking down and removing the fence hereinafter spoken of. The Illinois and Michigan Canal is owned by the State of Illinois and runs in a direction northeast and southwest through section 10, township 33 north, range 3 east, in La Salle County, Illinois. The lands in question are in this section, which was one of the sections of land reserved to the United States under the act of Congress approved March 2, 1827, hereinafter mentioned.

The plaintiffs in error claim that the State of Illinois owns a strip of land through that section on the south side of the canal,

ninety feet in width, contiguous to such south side. The defendants in error claim that the land which is owned by the State south of the canal is bounded on the south by a line seventeen instead of ninety feet south of the canal line; or in other words, they claim that the north line of their land runs up to within seventeen feet of the south side of the canal. The ownership of the land between these points from seventeen to ninety feet south of the canal is disputed, the plaintiffs in error claiming it for the State and the defendants in error claiming it for Mrs. Ingersoll, one of the defendants in error, who has had possession of the land for more than twenty years prior to November, 1897, and had prior to that time erected a fence on the line she claimed as her north line. This seventeen feet strip it would seem has been occupied by the tow path.

In order to test the question of title the plaintiffs in error, acting for the State, removed this fence, and thereupon the defendants in error sued them in trespass, claiming the fence was on their line and was their property. The question depends upon the construction of two acts of Congress in connection with the action of the state authorities in relation thereto. They are (1) the act of March 30, 1822, chapter 14; and (2) the act of March 2, 1827, chapter 51. They are, so far as is material, set forth in the margin.[1]

---

[1] Act of March 30, 1822. Chap. XIV, 3 Stat. 659.

AN ACT to authorize the State of Illinois to open a canal through the public lands, to connect the Illinois River with Lake Michigan.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the State of Illinois be, and is hereby, authorized to survey and mark, through the public lands of the United States, the route of the canal connecting the Illinois River with the southern bend of Lake Michigan; and ninety feet of land on each side of said canal shall be forever reserved from any sale to be made by the United States, except in the cases hereinafter provided for, and the use thereof forever shall be, and the same is hereby, vested in the said State for a canal, and for no other purpose whatever; on condition, however, that if the said State does not survey and direct by law said canal to be opened, and return a complete map thereof to the Treasury Department, within three years from and after the passing of this act; or if the said canal be not completed, suitable for navigation, within twelve years thereafter; or if said ground shall ever cease to be occupied by, and used for, a canal, suitable for navi-

### Statement of the Case.

The plaintiffs in error claim that the title to the strip of land ninety feet wide through section 10 passed to the State by virtue of the act of 1822, while the defendants in error claim that the act of 1827 takes the place of the act of 1822, as to the grant of lands, and that under the act of 1827 every alternate section of the land along the line of the canal was reserved to the United States, and it is agreed that section 10 was among the sections so reserved.

---

gation, the reservation and grant hereby made shall be void and of none effect. . . .

SEC. 2. *And be it further enacted,* That every section of land through which said canal route may pass, shall be, and the same is hereby, reserved from future sale, until hereafter specially directed by law; and the said State is hereby authorized and permitted, without waste, to use any materials on the public lands adjacent to said canal, that may be necessary for its construction.

#### Act of March 2, 1827.    Chap. LI, 4 Stat. 234.

AN ACT to grant a quantity of land to the State of Illinois, for the purpose of aiding in opening a canal to connect the waters of the Illinois River with those of Lake Michigan.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That there be, and hereby is, granted to the State of Illinois, for the purpose of aiding the said State in opening a canal to unite the waters of the Illinois River with those of Lake Michigan, a quantity of land equal to one-half of five sections in width, on each side of said canal, and reserving each alternate section to the United States, to be selected by the Commissioner of the Land Office, under the direction of the President of the United States, from one end of said canal to the other; and the said lands shall be subject to the disposal of the legislature of the said State, for the purpose aforesaid, and no other. . . .

SEC. 2. *And be it further enacted,* That, so soon as the route of the said canal shall be located and agreed on by the said State, it shall be the duty of the Governor thereof, or such other person or persons as may have been, or shall hereafter be, authorized to superintend the construction of said canal, to examine and ascertain the particular sections to which the said State will be entitled, under the provisions of this act, and report the same to the Secretary of the Treasury of the United States.

SEC. 3. *And be it further enacted,* That the said State under the authority of the legislature thereof, after the selection shall have been so made, shall have power to sell and convey the whole, or any part of the said land, and to give a title in fee simple therefor, to whomsoever shall purchase the whole or any part thereof.

After the passage of the act of Congress of 1822 the General Assembly of the State of Illinois on February 14, 1823, passed an act in which provision was made for the appointment of a board of commissioners to consider, devise and adopt such measures as might be requisite to effect a connection by a canal and locks between the navigable waters of Illinois River and Lake Michigan. It was made the duty of these commissioners to cause that part of the territory of the State which may lie open or contiguous to the probable courses and ranges of the canal to be explored and examined for the purpose of fixing and determining the most proper and eligible route for the same, and to cause all necessary surveys, etc., to be made, and to make calculations and estimates of the cost, and to make a plain and comprehensive report of all their proceedings under the act to the General Assembly of the State at the commencement of the next session.

On January 18, 1825, the General Assembly of the State amended a prior act, and appropriated about two thousand dollars for the payment of the actual expenditures made and liabilities incurred by the canal commissioners appointed under the act of 1823. On January 17, 1825, the General Assembly incorporated the Illinois and Michigan Canal Company, and provided that the officers should obtain subscriptions to the stock, which should amount to a million dollars, and in a convenient time thereafter, and after ten per centum of the capital stock should have been paid in, the commissioners should proceed to construct a canal to connect the waters of the Illinois River and Lake Michigan, and the corporation was directed to proceed as rapidly to the completion of that object as might be deemed practicable and expedient, having in view the ultimate permanency of the work and the facility and safety of the communications. The size of the canal which the State had in contemplation is shown by reference to the fifth section of the act, wherein it is provided that the canal shall be of a width of forty feet at the summit, twenty-eight at the bottom, and of sufficient depth to contain water at least four feet deep. There is nothing in the record to show that these dimensions

were ever altered, although the act was repealed the next year, January 20, 1826.

In the preamble of the repealing act it was stated that the corporation had not performed any act by which the right of the General Assembly to repeal its charter could be taken away, and it was stated that it was believed that the highly important object of the act referred to could be promoted with greater advantage to the public by having the contemplated canal constructed under the direction of the State, and therefore the act of incorporation was repealed.

The Governor of the State was directed by the second section of the repealing act to endeavor to ascertain the best terms on which loans could be obtained on behalf of the State for the purpose of constructing the canal and to report the same to the General Assembly at its next session.

Pursuant to such direction, and on December 5, 1826, the Governor reported that capitalists were reluctant to commit themselves to any specific terms on which they would be willing to make a loan, but from the best information which he had received it was confidently believed that if Congress would make a liberal grant of land there would be no difficulty on the part of the State in obtaining a loan at six per centum, and the Governor suggested the propriety of adopting measures at that session to commence the work, predicated upon a liberal grant of land by Congress, which it was expected that body would make. The General Assembly at the same session adopted a memorial to Congress, in which it asked for a grant of land belonging to the United States for the purpose of aiding the construction of the canal, and in this memorial the following language was used:

"Your memorialists have caused the route to be explored and estimates to be made of the probable expense of the work; from which it appears that the cost of constructing the canal will not be less than $600,000, and may possibly amount to $700,000. To the end, therefore, that your memorialists may be enabled to commence and complete this great and useful work we pray your honorable body to grant to this State the respective townships of land through which the contemplated

canal may pass, the avails of which to be appropriated exclu-sively to the construction of said canal upon such terms and conditions as to your honorable body may seem proper."

Congress on March 2, 1827, passed the act already set forth. On January 22, 1829, the General Assembly passed an act provid-ing for the construction of the Illinois and Michigan Canal, and for the appointment of commissioners to effect that object.  By the fifth section the canal commissioners were directed to cause " those parts of the territory of this State which is upon or con-tiguous to the probable course or range of said canal to be ex-plored and examined for the purpose of fixing and determining the most popular and eligible route for the same ;  . . .  and as soon thereafter as they may be able to command sufficient funds and deem it expedient, shall commence the work of open-ing a canal, and constructing locks, aqueducts and dams and embankments, to effect a navigable communication between Lake Michigan and the Illinois River."

By the sixth section the canal commissioners were directed as soon as practicable, and in conjunction with the authorities of the Government, to select alternate sections of land granted to the State by the act of Congress of 1827, and when the selec-tion was made it was provided by section seven that the com-missioners should proceed to sell the lands thus selected and to make returns of the proceeds of such sale to the auditor of public accounts.

On September 23, 1829, the canal commissioners obtained from the secretary of state of the State of Illinois a map of the proposed route of the canal which had been made by J. Post and R. Paul, in the years 1823 and 1824, when proceeding under the act of Congress of 1822 and the state statute of 1823.  This map was obtained for the purpose of using the same in aid of their work of examining and locating the canal route from Lake Michigan to the Illinois River, but the duty of determining and adopting a route rested with the commissioners appointed under this state act of 1829, no route having up to that time been adopted.

During the years 1823 and 1824 the State through its above named engineers, Post and Paul, had surveyed and marked through the public lands of the United States the route of the

canal " connecting the Illinois River with *the southern bend of Lake Michigan,*" though it did not return a map thereof to the Treasury Department within three years from March 30, 1822 ; but some time between December 25 and the end of the year 1829 the State did return to the Treasury Department of the United States " a complete map of the route of the canal connecting the Illinois River with Lake Michigan." The map filed in 1829 is known as the Thompson map, and is the first and only one, so far as the record shows, ever filed with the Treasury Department. It was filed in December, 1829, under the provisions of the act of 1827. This fact appears from the certificate of the Commissioner of the General Land Office, and also from that of the secretary of the canal commissioners of the State. Both officials assert that the map was filed " under the provisions of the act of Congress approved March 2, 1827." The general route is said to agree in substance with that laid down on the map made by Messrs. Paul and Post.

The State commenced the construction of the canal in the year 1837, and completed it in 1847, upon the route as shown by the Thompson map filed in the Treasury Department.

*Mr. Howard M. Snapp* for plaintiffs in error.

*Mr. William M. Springer,* for defendants in error, submitted on his brief. .

MR. JUSTICE PECKHAM, after making the above statement of facts, delivered the opinion of the court. .

The plaintiffs in error claim that upon the passage of the above mentioned act of Congress of 1822 the State of Illinois immediately became vested with the title to a strip of land ninety feet wide on each side of the route of the canal through the public lands of the United States from Lake Michigan to the Illinois River, and that the act of Congress of March 2, 1827, did not alter or in any way affect the provisions of the act of 1822 or take away the title which they claim had already vested in the State upon the passage of that act ; that although the title

to any specific portion of land under the act 1822 was in the nature of a float until the route of the canal was surveyed and adopted and a map thereof made and filed in the Treasury Department, yet when that was done the title to the ninety feet on each side of the canal was vested in the State as of the date of the passage of the act.

The various land grants made by Congress to railroads are cited for the purpose of showing that the act of 1822 constituted a grant of lands *in præsenti* and absolute in character, although to be thereafter identified by future action. *Schulenberg* v. *Harriman,* 21 Wall. 44; *Leavenworth, Lawrence &c. Railroad* v. *United States,* 92 U. S. 733, 741; *Railroad Company* v. *Baldwin,* 103 U. S. 426; *United States* v. *Southern Pacific Railroad Company,* 146 U. S. 570; 146 U. S. 615; 168 U. S. 1.

The language of the act of 1822, it will be observed, is somewhat peculiar and differs from that generally used in the land grants to railroads, which usually contain the expression that " there be and is hereby granted " to the railroad companies the lands mentioned, or words of similar import. In this act it is provided that " ninety feet of land on each side of said canal shall be forever reserved from any sale to be made by the United States except in cases hereinafter provided for, and the use thereof forever shall be and the same is hereby vested in the State for a canal, and for no other purpose whatever—on condition, . . . if said ground shall ever cease to be occupied by and used for a canal suitable for navigation, the reservation and grant hereby made shall be void and of none effect. . . ."

By this language the strict technical title is not conveyed to or vested in the State. It is simply a provision withdrawing from sale this strip of land and vesting the use of it for a canal, and for no other purpose whatever, in the State, with a condition that if not so used the reservation and grant are to be void. If proceedings had in fact been taken under this act, the route surveyed and a map thereof made and filed in the Treasury Department in compliance with the provisions of the act, then the use of the land designated on the map so filed, for the purpose mentioned in the act of 1822, would very likely have vested in the State as of the date of such act. The action of the authorities

on the part of the State, after the passage of the act of 1827 and up to the filing of the map in 1829, shows, however, that it was the act of 1827 and not that of 1822 which was in their contemplation when the map was filed in the Treasury Department.

During 1823 and 1824 a route was surveyed and marked through the public lands of the United States for a canal connecting the Illinois River "*with the southern bend of Lake Michigan,*" but it does not appear that the route was ever adopted or that a map of such route was ever filed. The map which was filed in 1829 purported to show the route of a canal connecting the Illinois River with Lake Michigan, omitting the expression "with *the southern bend* of Lake Michigan," which latter description, it is said, would, if closely and technically followed, have taken the canal into the State of Indiana. The route of the canal laid out on the map filed did connect the canal with the waters of Lake Michigan in the State of Illinois, but not in terms with *the southern bend* of that lake. It is claimed, however, that the two descriptions, "the southern bend of Lake Michigan" and "the waters of Lake Michigan," are substantially identical, and that the route of the canal as marked on the map of 1829 is in all material matters the same as that surveyed under the act of 1822. However this may be, it cannot be denied that between 1822 and the passage of the act of Congress in 1827 no route had been adopted for the canal and no work of construction had been commenced thereon, although, as already stated, a route had been surveyed and marked, yet none had been adopted, and none was adopted until after the passage of the state act of January 22, 1829. This appears by the fifth section of that act, in which the canal commissioners were authorized to explore, examine and determine and fix upon the most proper and eligible route for a canal, and to cause maps, surveys, profiles, etc., to be made, and thereafter, when they deemed it expedient and funds could be secured, they were authorized to commence the work of constructing the canal. The sixth section of the same act had special reference to the selection of the land granted by the Congressional act of 1827.

The filing of a map with reference only to the act of 1827,

specifying both the sections reserved to the United States and those granted to the State under that act, would not thereby fix and identify lands which had been mentioned but not identified, in a different and prior act, and which were not referred to in any way in the map filed under the act of 1827. No lines showing the boundary of a strip ninety feet wide on each side of the canal were ever placed on the map which was filed in the Treasury Department in 1829, the only map which was ever filed there. That map showed the proposed route and also the sections granted to the State and those reserved to the United States, and the right of way along the route would be taken to be for a canal of the proposed width as stated in the acts of the General Assembly, and which width was accepted and acquiesced in by Congress and the Government.

It was not until 1848, eleven years after the work of construction was commenced and a year after the completion of the canal, as is stated by counsel for plaintiffs in error in his brief, that a survey was made of the ninety feet strip on each side of the canal from one end to the other, and the lines of that survey marked on maps under the directions of the canal commissioners, and the maps and profiles of the survey filed in the office of the state canal commissioners, but not with the Commissioner of the General Land Office or in the Treasury Department at Washington. This action of the canal commissioners was a mere *ex parte* assertion made by state officials upon their own maps, nearly twenty years after the filing of the map in the Treasury Department, indicating a possible claim of right on behalf of the State, but never laid down on any map filed in Washington.

The differences between the two acts in question and their inconsistent provisions are noticeable. That of 1822 provides for the use of land through the whole of the public domain ninety feet wide on each side of the canal. That of the act of 1827 grants a quantity of land equal to one half of five sections in width on each side of such canal, and reserves each alternate section to the United States, etc. In the sections reserved, therefore, no title to or use of the ninety feet on each side of

the canal is given, while in the alternate sections not reserved to the United States the whole title is granted to the State. The third section of the act of 1827 gives power to sell and give title in fee to the land granted, while the act of 1822 grants no title, and provides for resuming possession of the land if at any time the same is not used for a canal. The filing of a map under the act of 1827 would clearly not be a fulfilment of the provisions as to the filing made in the act of 1822.

The Congressional act of 1827, nevertheless, implies by its language and subject-matter the consent of Congress to a right of way through the public lands, and the subsequent state act of 1829, in the eleventh section, showed the width of the canal contemplated, which was the same as the prior and repealed act of 1825 provides for. Of course, a towpath would be added. These two acts show the intention of the parties to proceed thereafter with reference to the act of 1827 and not under that of 1822. Work was not in fact commenced until in 1837.

When Congress under the act of 1827 granted the alternate sections to the State throughout the whole length of the public domain, in aid of the construction of the canal, it also granted by a plain implication the right of way through the reserved sections, for it cannot be presumed the Government was granting all these alternate sections to the State for the purpose avowed, and yet meant to withhold the right to pass through the sections reserved to the United States along the route of the proposed canal. But the implication would not extend to the ninety feet on each side. It would extend to the land necessary to be used for the canal of the width contemplated, and that had been asserted in an act of the general assembly in 1825 and was subsequently reiterated in another act of that body (1829).

Upon all the facts in the case it is plain that the act of 1822 was mutually abandoned by the parties so far as concerned the land grant after the passage of the act of 1827, and that the right-of-way through the reserved sections was treated and regarded as impliedly granted by the latter act, under which the larger grant was made, and that the map was filed under that act, and none was ever filed under the act of 1822. The State

never took title to the strip of land ninety feet wide on each side of the route of the canal through the public lands, so far as related to the sections reserved to the United States by the act of 1827, of which section ten herein involved was one.

It is not a question of forfeiture of the grant under the act of 1822. There was no forfeiture; it was a mutual abandonment of that act for the act of 1827. Taking all the facts into consideration, the State never acquired an absolute title to the ninety feet strip, as by the language of the act of 1822 the use only was granted, and it required a subsequent filing of a map as provided for in that act before the right to the use was acquired and made definite and fixed as to any particular land, and before that time arrived the act of 1827 was passed, which was to a certain extent inconsistent with the former act, and the State in fact thenceforth proceeded under the later act and filed its map thereunder and constructed the canal with reference thereto.

We think the judgment of the Supreme Court of Illinois was right, and it is therefore

*Affirmed.*