Exception is taken to the refusal of the trial court to accept the second finding proposed by appellant. It constituted a statement of appellant's version of the second verbal contract. The terms thereof were in dispute, and there was a conflict of evidence thereon. It was a matter of fact for the determination of the trial court, and conclusion of the trial court thereon, being sustained by substantial evidence, will not be disturbed on appeal. The finding as tendered contained matter which the trial court determined was not true, and consequently it properly refused to accept it.

The trial court, in effect, held that appellee was entitled to the reasonable value of labor made necessary in caring for said cattle after the expiration of the first contract. Appellant argues that he was entitled to a judgment for the difference between the value of the feed purchased by him and the value of the gain in weight placed on the cattle, amounting to $62, because no contract was made by the parties with reference to caring for the cattle at that time. The argument is based upon a false premise, in that the trial court held, and the finding is supported by substantial evidence, that while no "specific contract" was made between the parties, still the "plaintiff, at the request of the defendant continued to hold and feed said cattle for about 60 days longer."

For the reasons stated, the judgment of the trial court is affirmed; and it is so ordered.

HANNA, C. J., and ROBERTS, J., concur.

[No. 2021, Jan. 14, 1918.]
(Rehearing Denied Feb. 23, 1918.)
## JACKMAN v. ATCHISON, T. & S. F. R. CO.

### SYLLABUS BY THE COURT.

1.   Where a railroad company has complied with the provisions of Act Cong. March 3, 1875, c. 152, 18 Stat. 482 ( U. S. Comp. St. 1916, §§4921-4926), and the Secretary

of the Interior has approved its profile map, showing its right of way and station grounds, and such approval has been noted on the plats in the local land office, the omission of the reservation from the patent or final receipt of an entryman, who settled upon the land after the rights of the railroad company accrued, would not operate to give the patentee title to land which had been theretofore vested in the railroad company. P. 286

2. The act of Congress (Act March 3, 1875, c. 152, 18 Stat. 482) provides two methods by which a railroad company can acquire ground for its right of way and station grounds. Under the first section of the act (U. S. Comp. St. 1916, § 4921) the right of way may become definitely located, and title acquired by the actual construction of the railroad over the public domain. Under the fourth section (section 4924) the right of way and station grounds may be acquired by (1) location of the road; (2) filing a profile of it in the local land office; and (3) the approval thereof by the Secretary of the Interior, to be noted upon the plats in the local land office. P. 289

3. If at the time the railroad company seeks to appropriate land, which is a part of the public lands of the United States, such land is subject to entry and sale, it is entitled to the benefits of the act, notwithstanding that such land may have been reserved from entry and sale at the date of the pasasge of the act of Congress of March 3, 1875. The status of the land at the date the appropriation is sought controls the right of the railroad company; not its status at the date of such act. P. 290

4. The words "public lands" are not always used in the same sense. Their true meaning and effect are to be determined by the context in which they are used, and it is the duty of the court not to give such a meaning to the words as would destroy the object and purpose of the law or lead to absurd results. P. 293

5. The provision of section 4 of such act, which requires a railroad company, desiring to avail itself of the benefits of such act, to file a profile of its road, within 12 months after the location of any section of 20 miles of its

road, is directory, and a railroad company may file such map, and secure the benefits of the act after such period of time has elapsed, if it so elects, and the fact that it has completed its railroad does not prevent it from obtaining station grounds under such act, if the land is public land, subject to entry and sale, at the time it applies therefor
P. 293

6.   The approval, by the Secretary of the Interior of the profile of a railroad company, filed under the provisions of the act of March 3, 1875, showing its claim to lands for station grounds, is conclusive against collateral attack, if such land was, at the time of such approval, public lands of the United States, and subject to entry and sale.    P. 293

7.   The words "public lands," when a different intention is not clearly expressed, are used in legislation of Congress to designate such land as is subject to sale or other disposal under general laws, but not such as is reserved by competent authority for any purpose or in any manner, although no exception of it is made.    P. 293

Appeal from District Court, Dona Ana County; Medler, Judge.

Suit by Royal Jackman against the Atchison, Topeka & Santa Fe Railroad Company. Judgment for defendant, and plaintiff appeals. Affirmed. See, also, 22 N. M. 422, 163 Pac. 1084.

J. H. PAXTON, of Las Cruces, for appellant.

Act of Congress granting right of way expressly excepted lands reserved from sale, and court cannot extend act to apply to reserved lands.

Swift v. Luce, 27 Me. (14 Shep.) 285; in re Hughes, 1 Bland. 46; in re Ticknor's Estate, 13 Mich. 44; Tompkins v. First Nat. Bank, 18 N. Y. S. 234; Hadden v. The Collector, 72 U. S. 107; in re Election of Executive Officers, 47 N. W. 923; State v. Reneau, 106 N. W. 451; Rothchild v. N. Y. Life Ins. Co., 97 Ill. App. 547; Atty.

Gen. v. Parsell, 58 N. W. 839; Roberts v. Cannon, 20 N. C. 398; Denn v. Reid, 10 Pet. 524; Raleigh etc. Co. v. Reid, 13 Wall. 269; Stevens v. Smith, 10 Wall. 321; Sutherland on Stat. Const., Sec. 431; Northern Lumber Co. v. O'Brien, 139 Fed.

The grant of a right of way does not include station grounds.

Maysville etc. Co. v. Ball, 56 S. W. 191.

W. C. REID, of Albuquerque, and HOLT & SUTHER-LAND, of Las Cruces, for appellee.

Act of Congress did not operate to reserve or vest in proposed grantee any exclusive right or title prior to definite location.

Northern Pac. Ry. Co. v. Sanders, 166 U. S. 620; 13 Stat. 365; U. S. v. Oregon & Cal. R. R. Co., 176 U. S. 228; Railroad Co. v. Freemont County, 9 Wall. 89; 18 Stat. 482, 6 Fed. Stats. Ann. 501; D. & R. G. R. R. Co. v. Alling, 99 U. S. 463.

Wrongful rejection of original application of appellee's predecessor for station grounds, did not extinguish equitable rights.

Ard v. Brandon, 156 U. S. 541.

Action of Secretary of Interior, in approving map, is conclusive.

Van Patten v. Boyd, 20 N. M. 250; Shepley v. Cowan, 91 U. S. 330, 23 Law 424.

The decisions of the Department of the Interior are in line with this view, and while, of course, they are not binding upon the courts, they are nevertheless entitled to great respect, and ought not to be overruled without cogent reasons.

Keener v. R. R. Co., 31 Fed. 126; N. M. v. U. S. Trust Co., 172 U. S. 181, 43 Law 410.

The holder of a legal title in bad faith must always yield to a superior equity. As against the United States his title may be good, but not as against one who had acquired a prior right from the United States

in force when his purchase was made under which his patent issued.

Widdicombe v. Childers, 124 U. S. 400, 31 Law 427; Bohall v. Dilla, 114 U. S. 47, 29 Law 61; E. P. B. Co. v. McKnight, 233 U. S. 250, 58 Law 943; Van patten v. Boyd, supra.

## OPINION OF THE COURT.

ROBERTS, J.   The appellant brought suit against the appellee to quiet title to certain described real estate.   He claimed the land by virtue of a patent issued by the land office to 160 acres of land, which patent he contended embraced the land in dispute.   The patent was issued to William F. Higgins on June 10, 1892, and noted thereon were the words: ''Subject to the right of way of the A. T. & S. F. Ry. Co.''   Appellant derived title to the land by conveyance from the predecessor in interest to the patentee.   Appellee claims the land in dispute under the provisions of the act of Congress approved March 3, 1875 (18 Stats. 482), entitled ''An act granting to railroads the right of way through the public lands of the United States.''   The case was determined upon an agreed statement of facts, which, when summarized, shows the following:

Appellant's predecessor in interest, the patentee of the land under whom he claims, settled upon the land covered by his patent after whatever rights which the appellee has accrued.   On December 23, 1890, William F. Higgins received final receipt from the United States land office at Las Cruces, N. M., for his homestead entry, including said lot 2, section 35, township 26 south, range 3 east, within which is included the land in dispute.   The final receipt had noted thereon, ''Except where it is in conflict with the A. T. & S. F.. R. R. station grounds.''   The deeds through which appellant claims had no reservation of any kind, and purported to convey the entire quarter section of land, including said lot 2.

On March 3, 1871, the act of Congress was approved by the President, entitled "An act to incorporate the Texas Pacific Railroad Company, and to aid in the construction of its road, and for other purposes," by which act the said railway company was incorporated, and it was provided among other things, as follows:

"Section 1.    *    *    *    And the said corporation is hereby authorized and empowered to lay out, locate, construct, furnish, maintain, and enjoy a continuous railroad and telegraph line, with the appurtenances, from a point at or near Marshall, county of Harrison, state of Texas; thence by the most direct and eligible route, to be determined by said company, near the thirty-second parallel of north latitude, to a point at or near El Paso; thence by the most direct and eligible route, to be selected by said company, through New Mexico and Arizona, to a point on the Rio Colorado, at or near the southeastern boundary of the state of California; thence by the most direct and eligible route to San Diego, California, to ship's channel, in the bay of San Diego, in the state of California pursuing in the location thereof, as near as may be, the thirty-second parallel of north latitude, and is hereby vested with all the powers, privileges, and immunities necessary to carry into effect the purposes of this act.    *    *    *

"Sec. 9    That for the purpose of aiding in the construction of the railroad and telegraph line herein provided for, there is hereby granted to the said Texas Pacific Railroad Company, its successors and assigns, every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile, on each side of said railroad line, as such line may be adopted by said company, through the territories of the United States, and ten alternate sections of land per mile on each side of said railroad in California, where the same shall not have been sold, reserved, or otherwise disposed of by the United States, and to which a pre-emption or homestead claim may not have attached at the time the line of said road is definitely fixed.

"Sec. 12.    *    *    *    Said company, within two years after the passage of this act, shall designate the general route of its said road, as near as may be, and shall file a map of the same in the Department of the Interior; and when the map is so filed, the Secretary of the Interior, immediately thereafter, shall cause the lands within forty miles on each side of said designated route within the territories, and twenty miles within the state of California, to be withdrawn from pre-emption, private entry, and sale. *    *    *    "    Act Cong. March 3, 1871, c. 122, 16 Stat. 573, 576, 577.

On a certain day between August 15, 1871, and November 22, 1871, in pursuance of the said act of Congress, the Texas & Pacific Railroad Company, filed in the General Land Office of the United States at Washington, D. C., its map of the general location of the route of its railroad from El Paso, state of Texas, to ship's channel, San Diego, state of California, certified to by the proper officers of the said company.

On November 22, 1871, the Commissioner of the General Land Office at Washington transmitted to the register and receiver of the United States land office at Santa Fe, N. M., a letter withdrawing lands from entry within the limits of 40 miles on each side of the route indicated in such map so filed by said railway company as authorized by such act. Lot 2, heretofore referred to, was included within the land covered by the provisions of the statute and the orders of the General Land Office.

On November 28, 1881, the official public survey of the land, including such lot, was officially approved by the proper officer acting on behalf of the United States. On February 28, 1885, an act of Congress (23 Stat. 337, c. 265) was approved, entitled "An act to declare a forfeiture of lands granted to the Texas Pacific Railroad Company, and for other purposes" by which act it was provided that such grant of land should be forfeited, and all such lands are declared to be a part of the public domain. By a proviso station grounds and right of way were exempted from the forfeiture.

On April 18, 1881, there was organized a railroad corporation known as the "Rio Grande, Mexico & Pacific Railroad Company" under and pursuant to the laws of the territory of New Mexico, which said railroad corporation, prior to the 1st day of July, 1881, constructed that certain line of railway in said county and territory now owned and operated by the appellee herein, and which passed through said station of La Tuna, located upon the land in dispute, in the county of Dona Ana, state of New Mexico. Within twelve

months after the location of the section of the railroad referred to, the company under and pursuant to the provisions of the act of Congress approved March 3, 1875, filed with the register of the United States land office at Las Cruces, N. M., a map and profile of its railroad, which filing, profile, and map were approved by the Secretary of the Interior on December 15, 1881, and such approval noted upon the plats in said land office. The company also filed a certified copy of the articles of incorporation and due proof of its organization under the same with the Secretary of the Interior, which were approved by him on June 10, 1881, under the provisions of said act of March 3, 1875. On December 15, 1881, said railroad company for the purpose of securing the benefit of said act of March 3, 1875, of right of way and station grounds on public lands, filed in the United States land office at Las Cruces, N. M., a map of its proposed station grounds at Anthony, or La Tuna, N. M., including a part of said lot 2 and including the land in dispute in this case. Said filing purports to have been made pursuant to the rules and regulations of said land office and of the government of the United States for the disposition and disposal of the public domain, and which said map included an area not exceeding 20 acres in extent. Said filing was rejected by the local land office on the ground that the land was a part of the Texas & Pacific grant. Thereafter, and on, to-wit, the 20th day of May, 1885, a duplicate of said map, filing, and application was submitted to and approved by the Secretary of the Interior, and the fact of such approval was noted upon the plats in said United States land office at Las Cruces, N. M. The land in question was within the jurisdiction of said land office.

On February 15, 1889, all of the right of way, station grounds, rights, and privileges and franchises of said Rio Grande, Mexico & Pacific Railroad Company were conveyed by deed to appellee. Both corporations were duly and legally incorporated. From such stipulated facts the court made findings of fact, and stated

conclusions of law and entered judgment for the appellee.

Assuming that appellant is not foreclosed from questioning appellee's title to the land in dispute by reason of the receipt and acceptance by the Secretary of the Interior of the articles of incorporation of appellee's predecessor, and the subsequent approval by that officer of the profile of the road, showing the appropriation of the station grounds in question by appellee's predecessor, which will be considered later, we will go to a consideration of the merits of appellant's claim of title.

[1] It is appellant's contention that the land in question was reserved from entry and sale between November 22, 1871, and February 28, 1885, and that defendant's predecessor's proceedings to acquire station grounds, including the land in dispute, under the act of March 3, 1875, were had between July 1, 1881, and February 28, 1885, while the land in question was specifically reserved from entry and sale, except the approval by the Secretary of the Interior on May 20, 1885, of a duplicate of the map of station grounds presented to him for such action after the land in question had been restored to the public domain; that, under the provisions of the act of March 3, 1875, appellee or its predecessor was required to file a profile of its road within 12 months after the survey; that appellee's predecessors attempted to do this and failed, the plat being rejected because the land was specifically reserved from sale, and therefore not subject to the operations of the statute; and that there is nothing in the act extending its operation to reserved lands that may perhaps afterwards be thrown open, and the court should not so extend it. Appellee contends in answer to this argument that the withdrawal by the Commissioner of the General Land Office of lands within the Texas & Pacific grant was under a map of the general route, and was ineffectual as distinguished from a withdrawal upon definite location; that it did not operate to reserve or vest in

the proposed grantee an exclusive title or right prior
to definite location. The act of March 3, 1871, incor-
porating the Texas & Pacific Railway Company and
making a donation of land to aid in its construction,
provided that the company should, within two years
after the passage of the act, designate the general route
of its road, and should file a map of the same in the
Department of the Interior, and should thereafter im-
mediately cause the lands within 40 miles on each side
of all said designated route within the territories to be
withdrawn from pre-emption, private entry and sale.
This was done. The sections of the act of March 3, 1875
(18 Stats. 482), which require consideration in deter-
mining the issues in this case are sections 1, 4, and 5,
which read as follows:

"Be it enacted by the Senate and House of Representa-
tives of the United States of America in Congress assembled,
that the right of way through the public lands of the United
States is hereby granted to any railroad company duly
organized under the laws of any state or territory, except
the District of Columbia, or by the Congress of the United
States, which shall have filed with the Secretary of the
Interior a copy of its articles of incorporation, and due
proofs of its organization under the same, to the extent of
one hundred feet on each side of the central line of said
road; also the right to take, from the public lands ad-
jacent to the line of said road, material, earth, stone, and
timber necessary for the construction of said railroad; also
ground adjacent to such right of way for station buildings,
depots, machine shops, side tracks, turnouts, and water
stations, not to exceed in amount twenty acres for each
station, to the extent of one station for each ten miles of
its road."

"Sec. 4.    That any railroad company desiring to secure
the benefits of this act, shall, within twelve months after
the location of any section of twenty miles of its road, if the
same be upon surveyed lands, and, if upon unsurveyed lands,
within twelve months after the survey thereof  by the
United States, file with the register of the land office for
the district where such land is located a profile of its road;
and upon approval thereof by the Secretary of the Interior
the same shall be noted upon the plats in said office; and
thereafter all such lands over which such right of way shall
pass shall be disposed of subject to such right of way:
Provided, that if any section of said road shall not be com-
pleted within five years after the location of said section,

the rights herein granted shall be forfeited as to any such uncompleted section of said road.

"Sec. 5.    That this act shall not apply to any lands within the limits of any military, park, or Indian reservation, or other lands specially reserved from sale, unless such right of way shall be provided for by treaty stipulation or by act of Congress heretofore passed."

U. S. Comp. St. 1916, §§ 4921, 4924, 4925.

The fifth section, it will be noticed, makes the act inapplicable to "lands specifically reserved from sale." As these lands had been withdrawn from entry or sale by the Secretary of the Interior under authority of an act of Congress the predecessor of appellee possibly acquired no right to the land in controversy, or its right of way, during the time the withdrawal order was in force and effect, but a decision of this question is not necessary in this case, for we may assume that the railroad company acquired no right to its right of way or station grounds prior to February 28, 1885, when the act of Congress annulling the grant to the Texas & Pacific Railroad Company and restoring the lands to the public domain became a law, for when such land reverted to the public domain and the railroad company was using the right of way and filed in the office of the Secretary of the Interior a profile of its road, it became entitled to the benefits of the act of March 3, 1875, and its title to the station grounds and right of way is unassailable as we shall attempt to demonstrate.

Appellant seemingly attaches some importance to the fact that the station grounds were not excepted from the patent issued to his predecessor in title, but this is of no importance if appellee's predecessor was entitled to receive the benefits of the act of March 3, 1875, and took the required steps to bring itself within the operation of that act. The mere fact of the omission of the reservation from the patent or the final receipt would not operate to give the patentee title to land which had been theretofore patented or transferred to another.

In the case of Railroad Co. v. Stringham, 38 Utah, 113, 110 Pac. 868, the question was considered by the Supreme Court of Utah, and the court said:

Jackman v. A. T. & S. F. Ry. Co., 24 N. M. 278.

"Nor is it made to appear whether the mineral patent issued to Treweek in 1889 was in terms made subject to the right of way, but since section 4. of the act provides that 'all such lands over which such right of way shall pass shall be disposed of subject to such right of way,' it again will be presumed, in the absence of a showing to the contrary, that the subsequent disposition made to Treweek was subject to the right of way, and in any event, since the title to the right of way vested in plaintiff's predecessor upon the Secretary's approval of the profile of its road, it matters not whether the subsequent grant to Treweek was or was not in terms made subject thereto, for the law itself made it so. Railroad Co. v. Baldwin, 103 U. S. 426, 26 L. Ed. 578; Northern Pac. Ry. Co. v. Townsend, 190 U. S. 267, 23 Sup. Ct. 671, 47 L. Ed. 1044."

In the case of Northern Pacific Ry. Co. v. Townsend, supra, cited by the Supreme Court of Utah, Mr. Justice White said:

"At the outset, we premise that, as the grant of the right of way, the filing of the map of definite location, and the construction of the railroad within the quarter section in question preceded the filing of the homestead entries on such sections, the land forming the right of way therein was taken out of the category of public lands subject to pre-emption and sale, and the land department was therefore without authority to convey rights therein. It follows that the homesteaders acquired no interest in the land within the right of way because of the fact that the grant to them was of the full legal subdivisions."

The failure of the patent to except the station grounds in question therefore can be dismissed from further consideration.

[2] Passing now to a consideration of the act of March 3, 1875, we will determine the effect of the subsequent restoration of the withdrawn land to the public domain and the filing by appellee's predecessor thereafter, and long after its road had been completed of the profile of its road showing its claim to the station grounds under section 4 of the act, and the approval thereof by the Secretary of the Interior. The act of Congress in question provides two methods by which a railroad company can acquire ground for its right of

way and station grounds. Under the first section of
the act the right of way may become definitely located
and title acquired by the actual construction of the
railroad over the public domain. That this is so was
held by the Supreme Court of the United States in the
case of Jamestown & N. R. R. v. Jones, 177 U. S. 125,
20 Sup. Ct. 568, 44 L. Ed. 698, and later approved by
the same court in the case of Stalker v. Oregon Short
Line, 225 U. S. 143, 32 Sup. Ct. 636, 56 L. Ed. 1027.
In the latter case it is intimated, but not decided, that
the railroad company might, by taking possession of its
station grounds and marking the same in a manner suf-
ficient to give notice of its appropriation assert title
thereto without filing the profile map required by sec-
tion 4 of the act.

[3] The fourth section of the act was intended to
serve another purpose. It provided a method by which
a railroad company, desiring to secure the benefits of
the act and give fixity of location to its right of way
before its road should be constructed, could do so by
complying with this section, and thereby cut off the
rights of others to appropriate lands which it required
for these purposes in advance of the construction of its
road. This was the view held by Secretary Vilas in
Dakota Central Railroad Company v. Downey, 8 Land
Dec. 115, and approved by the Supreme Court of the
United States in the case of Jamestown & N. R. R. v.
Jones, supra, and this view is sustained by the follow-
ing additional authorities: Railroad Co. v. Hannoun,
19 Colo. 162, 34 Pac. 838; Minneapolis & St. Paul, etc.,
R. R. Co. v. Doughty, 208 U. S. 251, 28 Sup. St. 291, 52
L. Ed. 474; Oregon, etc., R. R. Co. v. Quigley, 10 Idaho,
770, 80 Pac. 401; Comford v. Great Northern Ry. Co.,
18 N. D. 570, 120 N. W. 875, 138 Am. St. Rep. 762;
Penn. M. & I. Co. v. Everett & M. C. Ry. Co., 29 Wash.
102, 69 Pac. 628.

But, assuming that the construction put upon the
two sections in question is correct, the question remains
as to whether appellee's predecessor's fell within the

terms of the granting act, assuming that during the time the land was withdrawn from sale under the act of Congress agreeing to 'donate the land to the Texas & Pacific Railroad Company, the railroad company was not entitled, under the act of March 3, 1875, to initiate or perfect a title to the land. The uniform construction of the act of March 3, 1875, by the Supreme Court of the United States is that it is a grant ''in præsenti'' of land to be thereafter identified. Stalker v. Oregon Short Line, supra.

The first essential step on the part of a railroad company desiring to avail itself of the benefits of the act is to file with the Secretary of the Interior a copy of its articles of incorporation and due proof of its organization under the same. This appellee's predecessor did in the instant case. By the act, after filing a copy of the articles of incorporation and due proof of its organization under the same, the railroad company can acquire its right of way, as stated by one of two courses: (a) By actual construction; or (b) by (1) location of the road, (2) filing a profile of it in the local land office, and (3) the approval thereof by the Secretary of the Interior, to be noted upon the plats in the local land office.

The confusion in the present case results from an interpretation placed upon the act to the effect that it is a grant ''in præsenti'' of lands to be thereafter identified. If we understand appellant's contention, it is that we must look to the status of the land at the time of the inception of the railroad's claim, and if at such time the land is not a part of the public domain, subject to entry or sale, the railroad company cannot avail itself of the benefits of the act, although thereafter the land becomes a part of the public domain, after which time the railroad company asserts title thereto, either by retaining the land for its right of way by virtue of its having a constructed road operating over the same, or by filing a profile of its road with the Secretary of the Interior, showing its station grounds and right of way, and securing the approval of that officer to the same.

Appellant contends that the grant under the act of March 3, 1875, is similar to a grant made of public lands to aid in the construction of a railroad. As to these latter grants, the courts have uniformly held that they were grants "in præsenti," and are in terms confined to public lands; that land not public land at the date of the grant is not granted, even though it subsequently becomes of that character. Northern Lumber Co. v. O'Brien, 139 Fed. 614, 71 C. C. A. 598; Bardon v. Northern Pac. R. R. Co., 145 U. S. 535, 12 Sup. Ct. 856, 36 L. Ed. 806; Northern Pac. Ry. Co. v. De Lacey, 174 U. S. 622, 19 Sup. Ct. 791, 43 L. Ed. 1111; United States v. Southern Pac. R. R. Co., 146 U. S. 570, 13 Sup. Ct. 152, 36 L. Ed. 1091. Under such a grant the company takes a present title as of the date of the act to the land embraced by the terms of the grant. The words used in such granting acts, "that there be and hereby is granted," import a transfer of present title, not a promise to transfer one in the future, and the grantee takes title as of the date of the passage of the act, subject to exceptions contained in the act.

Under a grant, such as was under consideration by the court in the case of Northern Lumber Co. v. O'Brien, supra, the status of the land at the date of the grant controls. If at such time it was "public land," and fell within no specific exception contained in the granting act, it passed by the terms of the granting act to the railroad company. If it was at the time (the date of the enactment of the granting act) reserved from entry or sale, title did not pass to the grantee, even though at the time it asserted a claim to it, it had been restored to entry or sale. If, therefore, the cases so construing such acts afford a rule for the construction of the act of March 3, 1875, the asserted right of appellee, not only to its claim for lands for station grounds, but likewise for a right of way over all the land embraced in the withdrawal order, under the Texas & Pacific act, is without support, regardless of attempted compliance with

the act thereafter, or the status of the land at the time of such attempted compliance.

[4] The words "public land" have long had a settled meaning in the legislation of Congress, and, when a different intention is not clearly expressed, are used to designate such land as is subject to sale or other disposal under general laws, but not such as is reserved by competent authority for any purpose or in any manner, although no exception of it is made. Northern Lumber Co. v. O'Brien, supra, and cases cited.

[5–7] The first section of the act of March 3, 1875, provides:

"That the right of way through public land of the United States is hereby granted," etc.

If Congress had intended that this act should receive the same construction as acts similar to the one considered in the Northern Lumber Co. case, and that the character of the land at the date of the grant should control the disposition of the land at the time application for the right of way was made, the provision of section 5 "that this act shall not apply to any lands within the limits of any military, park, or Indian reservation, or other lands specifically reserved from sale," etc., served no useful purpose. When this limitation upon the grant, and the purpose of the grant is considered, we believe it is clear that the term "public lands" should receive a broader construction.

The purpose of the act was to encourage the building of railroads through the public lands, thereby encouraging the settlement thereof, and the development of the resources of the country. Without the grant, assuming that the railroad might be constructed through the public lands, they would be compelled afterwards to pay for the lands taken by them for right of way and station purposes, when such lands had been acquired by private parties, and to pay an enhanced price for the lands so taken. Congress was desirous of aiding the railroads and encouraging them to build through pub-

lic lands.  The act contained a general offer to any rail-
road  company  which  would  construct a line of road
through public lands.  It said:

"You build a railroad through the public lands of the
United States, and we will give you a right of way, station
grounds, etc., but this grant should not apply to 'land
specially reserved from sale,' unless such right is granted
by act of Congress," etc.

That the land in question here was public land, in
that it was the property of the United States, at the
date of the passage of the act of 1875, is beyond dis-
pute.  It had, however, been reserved from sale.  Did
Congress intend that the reservation from the operation
of the granting act should apply to the status of the
land at the passage of the act, or at the time the claim
was made to it by the railroad company?  In view of
the purpose of the act, it is plain that the reservation
was intended to apply to the status of the land at the
time the claim was made to it by the railroad company.
If at the time the railroad asserted a right to the land,
under such act, the land was a part of the public do-
main, clearly Congress intended it should receive the
benefits of the act.  If at such time it was a part of an
Indian reservation, a military park, or had been special-
ly reserved from sale, then the act should not apply.

In the case of Union Pacific Ry. Co. v. Douglas Co.
(C. C.) 31 Fed. 540, Judge Brewer considered a right
of way grant made to the Union Pacific Railroad Co.
It was there contended that the grant did not apply to
school sections 16 and 36 reserved for the use of Ne-
braska when it became a state.  After citing cases sim-
ilar to the Northern Lumber Co. case, supra, he says:

"This only shows that, when land has been once re-
served, Congress will not be presumed to have intended a
disposition of it in any other way, unless the intent is clear-
ly expressed.  But that does not meet the question in this
case; for the act of Congress of July 1, 1862, does not
purport to grant the fee, but only a right of way.  The
reservation is not destroyed, but only a limited use placed
upon a narrow strip.  Now, that Congress meant that that

right of way should be through all lands over 'which it had control, is, I think, obvious for several reasons. I notice the principal: First, in the land grant made by this act Congress made specific exceptions of lands to which any pre-emption, homestead, or other claim had attached, while the grant of the right of way is absolute and without exception. This distinction is recognized in the case of Railroad Co. v. Baldwin, 103 U. S. 426 [26 L. Ed. 578] in which, after noticing the limitations and exceptions upon the land grant, the court adds these words: 'But the grant of right of way by the sixth section contains no reservations or exceptions. It is a present absolute grant, subject to no conditions except those necessarily implied; such as that the road shall be constructed and used for the purposes designed. Nor is there anything in the policy of the government with respect to the public lands which would call for any qualifications of the terms. Those lands would not be the less valuable for settlement by a road running through them. On the contrary, their value would be greatly enhanced thereby.' See, also, the case of Railroad Co. v. U. S., 92 U. S. 733 [23 L. Ed. 634], where the same distinction between a land grant and a grant of a right of way is recognized."

It is true, the Supreme Court of the United States in Washington & Idaho R. R. Co. v. Osborn, 160 U. S. 103, 16 Sup. Ct. 219, 40 L. Ed. 356, and Union Pacific R. R. Co. v. Harris, 215 U. S. 386, 30 Sup. Ct. 138, 54 L. Ed. 246, distinguished the above case and held that in view of section 3 of the act of March 3, 1875 (U. S. Comp. St. 1916, § 4923), it was apparently not the intention of Congress to grant a right of way over possessory claims of individuals. This section provided for the condemnation of a right of way over such possessory claims.

In the case of United States v. Blendaur, 128 Fed. 910, 63, C. C. A. 636, the Circuit Court of Appeals, Ninth Circuit, said:

"The words 'public lands' are not always used in the same sense. Their true meaning and effect are to be determined by the context in which they are used, and it is the duty of the court not to give such a meaning to the words as would destroy the object and purpose of the law or lead to absurd results."

The rule of construction is approved by Judge Lewis in the cases of United States v. Denver & R. G. R. R. Co. (C. C.) 190 Fed. 825.

No case' has been found passing squarely upon the question here presented, but in view of the purpose of the grant and the object in view, we think it was clearly the intention of Congress to grant the right of way over all the public lands of the United States, subject to the implied exception contained in section 3 of the act, and the specific exception contained in section 5, and that these exceptions applied to the status of the land at the time appropriation was sought, and not to its status at the time the act was passed. Any other construction would lead to absurd results. For example, a given description of land, belonging to the public domain of the United States, might have been withdrawn from entry or sale at the time of the passage of the act, and restored to entry and sale at the time appropriation was sought, and yet not subject to appropriation because so withdrawn at the date of the passage of the act. Again, such land might have been a part of the public domain, at the date of the passage of the act, subject to entry and sale, and yet have been withdrawn from entry at the time appropriation was sought. Giving the words ''public lands'' the construction contended for, and holding that its status at the date of the passage of the act controlled, the railroad company would be entitled to the right of way through such lands, notwithstanding such withdrawal. This was not the intention of Congress, and we do not understand appellant to contend that, because the land was withdrawn from entry at the date of the passage of the act of March 3, 1875, the appellee's predecessor could not acquire title to a right of way and station grounds, but that it could not do so because of the fact that at the time it initiated its claim to the same in 1880 or 1881 the land was still under such withdrawal order.

Appellant proceeds upon the theory evidently that the railroad company could not lawfully file a profile of its road after 12 months from the location of the 20-mile section of its road, and as the road in question had been completed for about five years prior to the time

the duplicate map was filed in the office of the Secretary of the Interior after the land had been restored to entry, that officer was without authority of law to approve the same. No decision of the Supreme Court of the United States is cited on the question, but it would seem that this provision of the statute as to the time of filing the map is directory, and it has been so construed by the Secretary of the Interior in the case of Battlement Reservoir Co., 29 Land. Dec. 112. In that case the question involved the construction of the act of March 3, 1891 (U. S. Comp. St. 1916, § 4935), relative to a statute "requiring a map of location to be filed within 12 months after the location of a canal, ditch, or reservoir if upon surveyed lands," in order to secure the benefits of the act. The Assistant Secretary of the Interior points out that the language of the statute there under consideration was the same as section 4 of the act of March 3, 1875, and said:

"The general act of March 3, 1875 (18 Stats. 482), granting rights of way through the public lands to railroad companies, contains the same provision respecting the filing of a map of location, and in the case of Milwaukee, Lake Shore & Western Railway Company, 12 L. 79, it was held that a map filed after the expiration of the prescribed period of 12 months cannot be approved by the Secretary of the Interior. The decision does not contain any discussion of the question, or disclose the reason for its adoption. It does not seem to be well grounded and is overruled."

In that case the sites for the reservoirs were located September 9, 1895, but the map of location was not filed in the local office until March 30, 1897.

For the foregoing reasons we are of the opinion that the company rightfully acquired the legal title to the land in controversy; but, if we are in error as to this proposition, appellant would nevertheless not be entitled to recover, for the approval by the Secretary of the interior of the profile of the road and of the map showing its claim to station grounds was conclusive, and his action is not subject to collateral attack. The act of March 3, 1875, invested the Secretary of the Interior

with the power of approving "the profile of its road,"
and provided that upon approval thereof by the Secre-
tary of the Interior the same should be noted upon the
plats in said office, and thereafter "all such lands over
which such right of way shall pass shall be disposed of
subject to such right of way." By this act the Secre-
tary of the Interior is vested with the power of deter-
mining whether or not the railroad company has com-
plied with the law entitling it to a right of way over
public lands, and whether the land which it sought for
right of way and station purposes was public domain
and subject to the terms of the granting act. At the
time the Secretary of the Interior approved the profile
and map filed by appellee's predecessors, the lands in
question were public lands, and the question whether
appellee's predecessor's were entitled to the benefits of
the grant was one which it was competent for the Sec-
retary of the Interior to decide, and, when decided and
his approval was noted upon the plats, the first section
of the act vested the right of way and station grounds
in the railroad company. By such approval the rail-
road company became at once vested with a right of
property in the right of way and station grounds, of
which it could only be deprived by a proceeding taken
directly for that purpose. In the case of Noble v. Un-
ion River Logging Railroad, 147 U. S. 165, 13 Sup.
Ct. 271, 37 L. Ed. 123, the court said:

"The position of the defendants in this connection is that
the existence of a railroad, with the duties and liabilities
of a common carrier of freight and passengers, was a juris-
dictional fact, without which the Secretary had no power
to act, and that in this case he was imposed upon by the
fraudulent representations of the plaintiff, and that it was
competent for his successor to revoke the approval thus
obtained; in other words, that the proceedings were a
nullity, and that his want of jurisdiction to approve the map
may be set up as a defense to this suit."

Reference is then made to number of cases which hold
that in every proceeding of a judicial nature there are
one or more facts which are strictly jurisdictional, the

existence of which is necessary to the validity of the proceedings and without which the act of the court is a mere nullity, citing numerous examples. The opinion then proceeds:

"There is, however, another class of facts which are termed quasi jurisdictional, which are necessary to be alleged and proved in order to set the machinery of the law in motion, but which, when properly alleged and established to the satisfaction of the court, cannot be attacked collaterally. With respect to these facts, the finding of the court is as conclusively presumed to be correct as its finding with respect to any other matter in issue between the parties. Examples of these are the allegations and proof of the requisite diversity of citizenship, or the amount in controversy in a federal court, which, when found by such court, cannot be questioned collaterally (Des Moines Nav. Co. v. Iowa Homestead Co., 123 U. S. 552 [8 Sup. Ct. 217, 31 L. Ed. 202]; In re Sawyer, 124 U. S. 200, 220 [8 Sup. Ct. 482, 31 L. Ed. 402]); the existence and amount of the debt of a petitioning debtor in an involuntary bankruptcy (Michales v. Post, 21 Wall. 398 [22 L. Ed. 520]; Betts v. Bagley, 12 Pick. 572); the fact that there is insufficient personal property to pay the debts of a decedent, when application is made to sell his real estate (Comstock v. Crawford, 3 Wall, 396 [18 L. Ed. 34]; Grignon's Lessee v. Astor, 2 How. 319 [11 L. Ed. 283]; Florentine v. Barton, 2 Wall. 210 [17 L. Ed. 783]); the fact that one of the heirs of an estate had reached his majority, when the act provided that the estate should not be sold if all the heirs were minors (Thompson v. Tolmie, 2 Pet. 157 [7 L. Ed. 381]); and others of kindred nature, where the want of jurisdiction does not go to the subject-matter or the parties, but to a preliminary fact necessary to be proven to authorize the court to act. Other cases of this description are. Hudson v. Guestier, 6 Cranch, 281 [3 L. Ed. 224]; Ex parte Watkins, 3 Pet. 193 [7 L. Ed. 650]; United States c. Arredondo, 6 Pet. 691, 709 [8 L. Ed. 547; Dyckman v. New York City, 5 N. Y. 434; Jackson v. Crawfords, 12 Wend. 533; Jackson v. Robinson, 4 Wend. 434; Fisher v. Bassett, 9 Leigh, 119, 131 [33 Am. Dec. 227]; Wright v. Douglass, 10 Barb. 97, 111. In this class of cases, if the allegations be properly made, and the jurisdiction be found by the court, such finding is conclusive and binding in every collateral proceeding. And even if the court be imposed upon, by false testimony, its finding can only be impeached in a proceeding instituted directly for that purpose. Simms v. Slacum, 3 Cranch, 300 [2 L. Ed. 446].

"This distinction has been taken in a large number of cases in this court, in which the validity of land patents

has been attacked collaterally, and it has always been held that the existence of lands subject to be patented was the only necessary prerequisite to a valid patent. In the one class of cases, it is held that if the land attempted to be patented had been reserved, or was at the time no part of the public domain, the Land Department had no jurisdiction over it, and no power or authority to dispose of it. In such cases its action in certifying the lands under a railroad grant, or in issuing a patent, is not merely irregular, but absolutely void, and may be shown to be so in any collateral proceeding. Polk's Lessee v. Wendall, 9 Cranch, 87 [3 L. Ed. 665]; Patterson v. Winn, 11 Wheat. 380 [6 L. Ed. 500]; Jackson v. Lawton, 10 Johns. 23 [6 Am. Dec. 311]; Minter v. Crommelin, 18 How. 87 [15 L. Ed. 279]; Reichart v. Felps, 6 Wall. 160 [18 L. Ed. 849]; Kansas Pacific Railway v. Dunmeyer, 113 U. S. 629 [5 Sup. Ct. 566, 28 L. 1122]; United States v. Southern Pacific Railroad, 146 U. S. 570 [13 Sup. Ct. 152, 36 L. Ed. 1091].

"Upon the other hand, if the patent be for lands which the Land Department had authority to convey, but it was imposed upon, or was induced by false representations to issue a patent, the finding of the department upon such facts cannot be collaterally impeached, and the patent can only be avoided by proceedings taken for that purpose. As was said in Smelting Co. v. Kemp, 104 U. S. 636, 640 [26 L. Ed. 875]: 'In that respect they [the officers of the Land Department] exercise a judicial function, and therefore it has been held in various instances by this court that their judgment as to matters of fact, properly determinable by them, is conclusive when brought to notice in a collateral proceeding. Their judgment in such cases is, like that of other special tribunals upon matters within their exclusive jurisdiction, unassailable except by a direct proceeding for its correction or annulment.' In French v. Fyan, 93 U. S. 169 [23 L. Ed. 812], it was held that the action of the Secretary of the Interior identifying swamp lands, making lists thereof and issuing patents therefor could be impeached in an action at law by showing that the lands which the patent conveyed were not in fact swamp and overflowed lands, although his jurisdiction extended only to lands of that class. Other illustrations of this principle are found in Johnson v. Powsley, 13 Wall. 72 [20 L. Ed. 485]; Moore v. Robbins, 96 U. S. 530 [24 L. Ed. 848]; Steel v. Smelting Co., 106 U. S. 447 [1 Sup. Ct. 389, 27 L. Ed. 226]; Quinby v. Conlan, 104 U. S. 420 [26 L. Ed. 800]; Vance v. Burbank, 101 U. S. 514 [25 L. Ed. 929]; Hoofnagle v. Anderson, 7 Wheat. 212 [5 L. Ed. 437]; Ehrhardt v. Hogaboom, 115 U. S. 57 [5 Sup. Ct. 1157, 29 L. Ed. 346]. In Moore v. Robbins, 96 U. S. 530, 533 [24 L. Ed. 848], it was said directly that it is a part of the daily business of officers of the Land Department to decide when a party has by purchase, by pre-emption, or by

any other recognized mode, established a right to receive from the government a title to any part of the public domain.   This decision is subject to an appeal to the Secretary of the Interior, if taken in time; 'but if no such appeal be taken, and the patent issued under the seal of the United States, and signed by the President, is delivered to and accepted by the party, the title of the government passes with this delivery.   With the title passes away all authority or control of the Executive Department over the land, and over the title which it has conveyed.   *   *   * The functions of that department necessarily cease when the title has passed from the government.'

"We think the case under consideration falls within this latter class.   The lands over which the right of way was granted were public lands subject to the operation of the statute, and the question whether the plaintiff was entitled to the benefit of the grant was one which it was competent for the Secretary of the Interior to decide, and when decided, and his approval was noted upon the plats, the first section of the act vested the right of way in the railroad company.   The language of that section is 'that the right of way through the public lands of the United States is hereby granted to any railroad company duly organized under the laws of any state or territory,' " etc.

The same rule was announced in the case of Smelting Co. v. Kemp, 104 U. S. 36, 26 L. Ed. 875.   To the same effect see, also, Doweese v. Reinhart, 61 Fed. 777; Oregon Trunk Line v. Deschutes R. Co. (C. C.) 172 Fed. 738.   In this latter case the syllabus states the point decided as follows:

"A railroad company cannot attack the title of another company to a right of way over the public lands, confirmed to it by the Secretary of the Interior under the statute, unless it shows that at the time of the grant it had itself an interest in such right of way, and was lawfully entitled to it instead of the grantee."

See, also, Van Patten v. Boyd, 20 N. M. 250, 150 Pac. 917.

For the foregoing reasons we conclude that the decision of the Secretary of the Interior in the exercise of the powers conferred upon him by the act of March 3, 1875 (18 Stats. 482), that a designated railroad company is entitled to a right of way over public land, is not subject to collateral attack.

While some other questions are discussed, the foregoing considerations dispose of the case, and it will therefore be affirmed; and it is so ordered.

HANNA, C. J., and PARKER, J. concur.